[No. D059211. Fourth Dist., Div. One. May 31, 2012.]

THOMAS W. SEFTON, JR., Plaintiff and Appellant, v.
HARLEY K. SEFTON, as Trustee, etc., Defendant and Respondent;
WELLS FARGO BANK, N.A., as Trustee, etc., Objector and Respondent.

COUNSEL

Van Dyke & Associates, Richard S. Van Dyke and James A. Bush for Plaintiff and Appellant.

Beamer, Lauth, Steinley & Bond and Stephen A. Bond for Defendant and Respondent.

Henderson, Caverly, Pum & Charney, Kristen E. Caverly, Debra J. Vella and Robert C. Mardian III for Objector and Respondent.

OPINION

NARES, J.—In this case of first impression we are asked to interpret provisions of the California Powers of Appointment Act (CPAA), specifically Probate Code sections 652 and 601 (all further undesignated statutory references are to the Probate Code).

J.W. Sefton, Jr. (Grandfather), executed his will in 1955 (Grandfather's Will). He later passed away in 1966, giving his son, Thomas W. Sefton (Father), a lifetime estate, with a portion of the remainder estate going to Father's "then living issue," identified in the will as his daughter, Laurie M. Sefton (Laurie) (here represented by Wells Fargo, N.A., as trustee), his son, Harley K. Sefton (Harley) (here represented by Harley K. Sefton as trustee of the Harley K. Sefton trust), and petitioner and appellant Thomas W. Sefton, Jr. (Thomas Jr.).[1]

Under the common law existing at the time Grandfather executed his will and when he passed away, the language "then living issue" was considered as giving Father a "non-exclusive power of appointment," meaning every one of Father's children that survived him must a receive at least a "substantial" part of the remainder estate. However, prior to Father's death, the Legislature enacted section 652, effective in 1970, which changed the presumption of such a power of appointment to "exclusive," meaning Father could exclude one or more of his "then living issue," unless Grandfather's Will specified a minimum or maximum amount to be distributed to each such heir (which in this case it did not).

When Father died in 2006, his will (Father's Will) gave portions of his estate to his children Laurie and Harley, but completely excluded Thomas Jr. from any inheritance.

The issue raised by this appeal is whether the law in effect at the time Grandfather executed his will, and at the time he passed away, controls, requiring that Father give each of his living issue, including Thomas Jr., at least a "substantial" share of his estate or is the law in effect at the time Father executed his will and passed away controlling, thus allowing Father to completely exclude one or more of his living issue.

We conclude that under the paramount rule regarding interpretation of wills that is to give effect to the intent of the testator, the language of section 601 that "[n]othing in this section makes invalid a power of appointment created

---

[1] In the interests of clarity, we refer to these parties by their first names. We intend no disrespect.

before July 1, 1970, that was valid under the law in existence at the time it was created," and concerns over the constitutionality of applying section 652 retroactively, under Grandfather's Will the power of appointment was "non-exclusive" and Father could not exclude Thomas Jr. from at least a "substantial" portion of the estate.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Background*[2]

In Grandfather's Will executed September 7, 1955, Grandfather created a trust (the Trust). The Trust estate included Grandfather's controlling stock position in San Diego Trust & Savings Bank, which control position Grandfather requested the trustee to retain in the Trust estate.

Joseph W. Sefton, Sr., opened the bank on May 15, 1889. When he died in 1908, his only son, Joseph W. Sefton, Jr. (Joseph, Jr.) then 26 years old, chose to become vice-president, leaving the presidency for the bank's original employee. Joseph, Jr., became president in 1935 when the original employee became president emeritus. (Davie, *A City, A Bank, A Family* (Spring 1989) The Journal of San Diego History <http://www.sandiegohistory.org/journal /89spring/city.htm> [as of May 31, 2012].) Thomas Jr. asserts that shares providing a controlling interest in San Diego Trust & Savings Bank at the time of Grandfather's death would now be worth at least hundreds of millions of dollars.

The contents of Grandfather's Will and the terms of the Trust are undisputed. Grandfather designated his son the lifetime beneficiary of income from the Trust estate. Upon Father's death, the Trust terminated and its assets were to be distributed.

Grandfather's Will further stated, "I have three grandchildren, children of my said son, Thomas Wolcott Sefton, namely, THOMAS W. SEFTON, JR., LAURIE MARILYN SEFTON and HARLEY KNOX SEFTON." If Father died leaving any issue (which he did, as Thomas Jr., Laurie and Harley all survived him), then Grandfather's Will provided in the language at issue in this case that: "[T]hree quarters (3/4) [of the Trust Estate] *shall be distributed to his then living issue as my said son shall by his Last Will and Testament appoint*, and in default of appointment, to his then living issue on the principle of representation." (Italics added.)

According to Thomas Jr., "[u]nder the law in effect at the time Grandfather's Will was executed in 1955 and at the time he died on March 3, 1966, the

---

[2] The facts of this case are largely undisputed.

creation of such a power of appointment [that did not state a minimum or maximum amount to be appointed to one or more permissible heirs was considered 'nonexclusive' and] required that the person exercising the power [(i.e., Father)] give at least a 'substantial' distribution to each member of the class of appointees identified by the creator." (See *Estate of Sloan* (1935) 7 Cal.App.2d 319, 340 [46 P.2d 1007].)

Father survived Grandfather by some 40 years, dying on November 7, 2006. Father left a will that he had executed on August 26, 1994.

Father's Will acknowledged that he had children Laurie and Harley of his current marriage and Thomas Jr. of his prior marriage. In article three, Father's Will exercised the power of appointment by splitting the property subject to appointment into three shares, two of which he allocated to a trust for which Harley was the beneficiary (and is now trustee), and the other one of which he allocated to a trust for which Laurie was the beneficiary (and for which defendant Wells Fargo is trustee). Father's Will gave Thomas Jr. nothing. At the time of Father's exercise of his power of appointment, the law had been changed, effective in 1970, to make the power of appointment considered "exclusive," meaning Father could exclude one or more of his living issue if Grandfather's Will did not specify that he was to give one or more of them a minimum or maximum share of the estate. (§ 652.)

B. *Procedural Background*

Thomas Jr. filed a petition on June 10, 2010, alleging that Father's attempted exercise of the power of appointment by excluding him from any share of the appointed property exceeded the scope of authority Grandfather gave Father. The petition further requested that the probate court determine that Thomas Jr. was entitled to a portion of the Trust estate and that a constructive trust be imposed on that portion.

Wells Fargo responded to the petition by filing a demurrer. Wells Fargo asserted that, because of the provisions of the CPAA that became effective July 1, 1970 (four years after Grandfather's death), Father was permitted to completely exclude Thomas Jr. from the appointed property. The demurrer further contended that, among other things, Thomas Jr.'s petition was barred by the statute of limitations contained in Code of Civil Procedure section 366.2.

On July 9, 2010, Harley filed a response and objection to petition for order ascertaining beneficiaries of trust. In that pleading, Harley also raised the statute of limitations and CPAA arguments that Wells Fargo raised in its demurrer.

The court sustained Wells Fargo's demurrer without leave to amend and dismissed the petition. In so doing, the court found: "Although Grandfather's will created the power, it was not exercised until [Father] died in 2006. The parties appear to agree that the law governing powers of appointment changed from the time of creation to the time of its exercise. Thus, according to [section] 601, this court is obliged to apply the law in existence at the time of the exercise, *i.e.*, in 2006. [¶] Accordingly, [section] 652[, subdivision] (a) permitted [Father] to exclude petitioner when he exercised the power. Further, because the power of appointment did not specify a maximum or minimum amount to be appointed to one or more of the permissible appointees, [section] 652[, subdivision] (b) does not apply."

Based upon its ruling, the court found the statute of limitations defense moot.

## DISCUSSION

### I. *APPLICABLE LEGAL PRINCIPLES*

█ "Powers of appointment have been aptly described as one of the most useful and versatile devices available in estate planning." (Recommendation and a Study Relating to Powers of Appointment (Oct. 1968) 9 Cal. Law Revision Com. Rep. (1969) pp. 301, 307 (hereafter 9 CLRC).) "A power of appointment is a power conferred by the owner of property (the 'donor') upon another person (the 'donee') to designate the persons ('appointees') who will receive the property [('appointive property')] at some time in the future." (*Ibid.*) Often, a trustor creates a trust "for the benefit of a designated person during his lifetime with a provision that, upon the death of the life beneficiary, the remaining property shall be distributed in accordance with an 'appointment' made by the life beneficiary." (9 CLRC, *supra*, at p. 307.) "Apart from their usefulness in minimizing death taxes, powers make possible a disposition reaching into the future but with a flexibility that can be achieved in no other way. . . . [The donor] has limited the benefits of his property to the objects of his bounty, but he has also permitted future distributions of principal and income to take account of changes in the needs of beneficiaries which he could not possibly have foreseen." (*Id.* at p. 308.)

Powers of appointment originated at common law and were codified in California through the Statute of 1850 and by the adoption of California's Civil Code in 1872. (*Estate of Sloan, supra*, 7 Cal.App.2d at p. 323.) "The Civil Code originally contained detailed sections on powers, which were repealed in 1874." (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 146, p. 204.) Following the 1874 repeal, there was some question about whether powers of appointment remained valid as a matter of common

law, but that question was answered in the affirmative by several judicial decisions, beginning in 1935 with *Estate of Sloan*. (12 Witkin, *supra*, Real Property, § 146 at p. 204.) Among other things, that case held that the repeal in 1874 of the Civil Code provisions restored powers of appointment as they existed at common law (except as might otherwise be provided by statute). (*Estate of Sloan, supra*, 7 Cal.App.2d at p. 332.)

*Estate of Sloan* also held that where the donor of a power of appointment designated a class of appointees and did not expressly give the donee any right of exclusion, no member of the designated class "may be entirely excluded by the donee of the power from at least a *substantial* participation in the distribution" of the appointive property. (*Estate of Sloan, supra*, 7 Cal.App.2d at p. 340, italics added.) In that case, similar to Grandfather's Will and Trust at issue here, the testator's will provided his trust estate would go to " 'the heirs of [son] as per [son's] last will and testament.' " (*Id.* at p. 321.) The son's will, however, gave the entire trust estate to one aunt even though he had other heirs. (*Ibid.*) Based upon the common law existing at the time, the Court of Appeal applied a presumption in favor of nonexclusive powers and, because the testator had not expressly given the son a right to exclude any heir, reversed the superior court's judgment that allowed the aunt to take the entire estate. (*Id.* at p. 342.)

In 1965, the California Legislature (through Stats. 1965, ch. 130, p. 398) directed the California Law Revision Commission (hereafter Law Revision Commission) to study powers of appointment. (9 CLRC, *supra*, at p. 303.) Richard R.B. Powell, then a professor at Hastings College of Law, prepared a background report and recommendations for the Law Revision Commission. The Law Revision Commission included Powell's research study (except for his suggested statutes) as part of its 1968 report, in which it recommended adoption of a number of proposed statutes. (9 CLRC, *supra*, at pp. 311–334, 335–352.) The result of the Law Revision Commission's recommendations and Powell's study was the CPAA, passed in 1969 as Civil Code former section 1380.1 et seq. and operative July 1, 1970. (12 Witkin, Summary of Cal. Law, *supra*, Real Property, § 146, pp. 204–205.) In 1992, Civil Code former section 1380.1 et seq. was repealed and replaced by Probate Code section 600 et seq., where the CPAA now exists. (12 Witkin, *supra*, Real Property, § 146, p. 204.)

In its 1968 report, the Law Revision Commission, after citing *Estate of Sloan*, stated that the then current law in California was that "a California donee must appoint to each of the permissible objects under a special power of appointment unless the donor has manifested a contrary intention in the creating instrument." (9 CLRC, *supra*, at p. 309.) The Law Revision Commission recommended "that the California rule be changed to embody the

preference for exclusive powers unless the donor manifests a contrary intention by providing a minimum or maximum amount for each permissible appointee." (*Id.* at pp. 309–310.) The Legislature accepted this recommendation and changed the nonexclusive presumption rule stated in *Estate of Sloan* to an exclusive presumption in adopting Civil Code section 1387.3 (now Prob. Code, § 652).

Section 652 provides: "(a) Except as provided in subdivision (b), the donee of a special power of appointment may appoint the whole or any part of the appointive property to any one or more of the permissible appointees and exclude others. [¶] (b) If the donor specifies either a minimum or maximum share or amount to be appointed to one or more of the permissible appointees, the exercise of the power must conform to the specification."

Of relevance to this appeal is the retroactivity provision in section 601, which provides: "If the law existing at the time of the creation of a power of appointment and the law existing at the time of the release or exercise of the power of appointment or at the time of the assertion of a right given by this part differ, the law existing at the time of the release, exercise, or assertion of a right controls. *Nothing in this section makes invalid a power of appointment created before July 1, 1970, that was valid under the law in existence at the time it was created.*" (Italics added.)

## II. *ANALYSIS*

Thomas Jr. asserts that the second sentence in section 601 means that Grandfather's power of appointment must be interpreted under the law existing prior to enactment of the CPAA, i.e., under the rule enunciated in *Estate of Sloan*, and therefore Father's appointment that excluded him as a donee was ineffective. Defendants on the other hand argue the first sentence controls, as it was the law in effect at the time Father exercised his power of appointment. They assert that the second sentence merely means that a power of appointment created before the effective date of the CPAA is not *invalid*.

### A. *Grandfather's Presumed Intent to Benefit All of Father's Living Issue*

█ We begin our analysis with a knowledge that " ' "[t]he paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible." ' " (*Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 134 [59 Cal.Rptr.2d 2, 926 P.2d 969] (*Newman*).) Section 21102, subdivision (a) similarly provides

that " '[t]he intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument.' " (*Newman, supra,* 14 Cal.4th at p. 134.)

In *Newman,* the question presented was whether, in determining a testator's intent where she did not give express direction in her will, a court should look to the Probate Code in effect both at the time she executed her will and at the time of her death or should instead refer to a later change in that code. (*Newman, supra,* 14 Cal.4th at p. 129.) The superior court had ruled that the law in effect at the time of execution and death should apply. (*Id.* at p. 130.) The Court of Appeal reversed and ordered that the new law be applied because "[the testator] was presumptively aware that the laws [applicable to the issue at hand] might change after her death . . ." and "this presumption was strengthened by the fact that the laws governing [the issue] had been amended drastically during her lifetime . . . ." (*Id.* at p. 132.)

The California Supreme Court reversed the Court of Appeal, reinstating the superior court's determination that the law at the time of execution and death controlled. (*Newman, supra,* 14 Cal.4th at p. 142.) In doing so, the *Newman* court held that the "paramount rule" (*id.* at p. 134) is that the testator's intent should be given effect as far as possible and, in divining that intent, a testator is presumed to be aware of the applicable law at the time a will is executed and to intend that law to govern construction of the will. The court further found that this presumption is strongest when an attorney drafts the will. (*Id.* at pp. 136, 138.) The high court concluded that the presumed intent of the testator should be determined by the law in effect when the will was executed because "[w]ere we to look to later enacted laws, . . . we would have to assume that a testator who is presumptively aware of the current meaning of the words the testator is using . . . intends to permit a future Legislature to change the pattern of distribution through a post mortem amendment of the law . . . ." (*Id.* at p. 139.) "It is more reasonable to assume that a testator who intends a different disposition [(i.e., other than as provided by law at the time the will is made)] will make express provision [therefor] than to assume that the testator intends that [devisees] not be established until some future time and be contingent upon legislative fiat." (*Id.* at p. 140.)

The law in effect at the time of the execution of Grandfather's Will was *Estate of Sloan,* which provided that Grandfather's power of appointment was deemed to be nonexclusive. As detailed, *ante,* as there were no statutory provisions dealing with powers of appointment until enactment of the CPAA effective in 1970, the rule enunciated in *Estate of Sloan* controlled. Because this was the law at the time of execution, Grandfather is presumed to have been aware of it and to have intended it to apply so as to benefit all of his grandchildren. This presumption is even stronger because Grandfather had

assistance from an attorney in drafting his will. Grandfather's Will had as its first witness the signature of Edgar A. Luce, a partner in a long-established San Diego law firm. This intent is further evidenced by the fact that Grandfather referenced by name his three grandchildren, Thomas Jr., Laurie and Harley. Had Grandfather intended to give Father an exclusive power, *Newman* presumes that he would have so drafted his will and would not have left it up to the vagaries of possible legislative changes to *Estate of Sloan* made after his death.

Harley asserts that in 1955 when Grandfather's will was drafted and 1966 when Grandfather died, Grandfather and/or his attorneys could not have reasonably relied on *Estate of Sloan* because at that time "*Sloan* was no longer reliable authority." However, this contention is directly contrary to the legislative history of the CPAA.

In its comments to the CPAA, the Law Revision Commission stated, "[Civil Code s]ection 1387.3 [now Probate Code section 652] changes California law as developed in *Estate of Sloan*, 7 Cal.App.2d 319 [46 P.2d 1007] (1935) . . . ." (9 CLRC, *supra*, at p. 321.) Elsewhere, the Law Revision Commission recommended that "the California rule be *changed* to embody the preference for exclusive powers unless the donor manifests a contrary intention by providing a minimum or maximum amount for each permissible appointee." (*Id.* at pp. 309–310, italics added.) Indeed, in the background article included as part of the Law Revision Commission's 1968 report that gave recommendations to the Legislature regarding powers of appointment, the author described the presumption of nonexclusive powers set forth in *Estate of Sloan* as "California's present position." (9 CLRC, *supra*, at p. 342.)

Thus, it is clear that until the CPAA was enacted, the rule enunciated in *Estate of Sloan* was the law in California, and we must presume, therefore, that Grandfather (and his attorney) intended that the power of appointment in his will be nonexclusive. (*Newman, supra*, 14 Cal.4th at p. 140.)

■ Harley asserts that we should not presume that Grandfather and his attorneys intended *Estate of Sloan* to govern Grandfather's Will because it was a court decision and not a statute. However, wills and trusts, "in the absence of showing a contrary intent, [must] be accorded the effect given them by statutory *or case law* [citations] prevailing at the time of the execution of the documents." (*Wells Fargo Bank v. Huse* (1976) 57 Cal.App.3d 927, 935 [129 Cal.Rptr. 522], italics added [interpreting what a trustor meant by "lawful issue" based upon both statutes and case law].) This is particularly so where at the time Grandfather executed his will and at the time he passed away there were no statutory provisions governing the issue, *Estate of Sloan* being the only controlling authority.

Indeed, any competent attorney advising a trustor at that time would have considered *Estate of Sloan* in drafting a power of appointment. That is because under its presumption of nonexclusive appointments, unless expressed otherwise, if Grandfather had intended the appointment to be exclusive, he would have had to express that intent *explicitly* in the will.

■ We now turn to the central issue in this matter: Did the enactment of the CPAA change the presumption of nonexclusive powers of appointment in wills that were irrevocable before it became effective in 1970? That is, where Grandfather's will was drafted and he passed away before the effective date of the CPAA, did the Legislature intend that the power of appointment be exclusive, even though contrary to Grandfather's intent and the terms of his will? We conclude that, based upon the language in the second sentence in section 601, the Legislature intended that the original intent of a donor that a power of appointment created before 1970 was nonexclusive was to remain unaffected by the provisions of the CPAA.

B. *Interpretation of Language of Section 601*

The Law Revision Commission's comment to section 601 states that this section "deals only with the 'release' or 'exercise' of a power of appointment or the 'assertion of a right' given by this part. *This section does not deal with 'creation' of powers of appointment, and nothing in the section makes invalid a power of appointment created before July 1, 1970, where the power was valid under the law in effect at the time it was created.*" (Cal. Law Revision Com. com., 52 West's Ann. Prob. Code (2002 ed.) foll. § 601, p. 315, italics added.) Witkin interprets the second sentence in section 601 to mean "a valid power created before the effective date of the [CPAA] is *unaffected by the statutory provisions.*" (12 Witkin, Summary of Cal. Law, *supra*, Real Property, § 146, p. 205, italics added.)

■ As we have discussed, *ante*, the law in effect at the time Grandfather's Will was created was that set forth in *Estate of Sloan*. The holding by the Court of Appeal in that case was that wills that used language such as Grandfather's Will gave a nonexclusive power of appointment, meaning Father could not exclude any of his heirs entirely from an inheritance and had to give each one at least a "substantial" portion of the estate. We interpret the second sentence of section 601 to mean that the nonexclusive power of appointment Grandfather provided for in his will remained intact after enactment of the CPAA because (1) the language of that sentence provides that the original power of appointment is unaffected by the terms of the later enacted CPAA, and (2) had the effect of leaving intact Grandfather's original intent in drafting his will.

Finally, defendants' argument that the second sentence of section 601 simply means that powers of appointment executed before the effective date of the CPAA were not rendered "invalid" is not persuasive. Nothing in the CPAA expressly or impliedly indicates any intent that such powers of appointment are rendered invalid by its terms. Nor could the Legislature legally declare powers of appointment that were otherwise properly drafted "invalid" by virtue of the CPAA. Moreover, the first sentence of section 601 only addresses the law governing the *exercise* of powers of appointment. It does not address the law governing *creation* of powers of appointment before the effective date of the CPAA. Defendants' interpretation thus makes the second sentence of section 601 unnecessary and superfluous.

## C.  *Retroactivity and Constitutional Problems*

To enact legislation that retroactively changes a donor's intent and a substantive part of the will after a will has been created and, in this case, after the donor has passed away, raises serious constitutional issues. Indeed, the Law Revision Commission noted that "[i]t is possible—but not likely—that this provision [(Civ. Code, § 1380.2 (now Prob. Code, § 601))] will be held unconstitutional." (9 CLRC, *supra*, at p. 333.) Accordingly, the Law Revision Commission recommended a severability clause to minimize any constitutional problems with the retroactivity clause of Civil Code section 1380.2 (now Prob. Code, § 601). (*Ibid.*) The Legislature also added the second sentence of Probate Code section 601 which ameliorates any constitutional problems with interfering with a donor's original intent expressed in a will that became irrevocable before the CPAA's effective date.

■ "[C]ourts should, if reasonably possible, construe a statute 'in a manner that avoids *any* doubt about its [constitutional] validity.' " (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 346 [110 Cal.Rptr.3d 628, 232 P.3d 625].) "If a statute is susceptible of two constructions, one of which renders it constitutional and the other unconstitutional (or raises serious and doubtful constitutional questions), the court will adopt the construction which will render it free from doubt as to its constitutionality, even if the other construction is equally reasonable." (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1101 [81 Cal.Rptr.3d 571].)

A corollary to this rule is that a statute affecting a substantive right will, if possible, be construed prospectively to avoid a declaration of unconstitutionality. (See *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207 [246 Cal.Rptr. 629, 753 P.2d 585]; *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 475 [20 Cal.Rptr.3d 428, 99 P.3d 1015].)

As discussed, *ante*, the Law Revision Commission noted that applying Civil Code section 1380.2 (now Prob. Code, § 601 of the CPAA) retroactively

could pose constitutional problems. Moreover, the Law Revision Commission, in commenting on Civil Code section 1380.2 (now Prob. Code, § 601), noted that New York, Wisconsin and other states had "recently enacted similar statutes." (9 CLRC, *supra*, at p. 308.) Addressing the New York law, one commentator noted "the new statute is to be applied to 'all powers of appointment . . . whether such powers were created before or after the effective date of the statute.' This retroactive application, if construed as altering any pre-existing rights, could subject the statute to constitutional attack." (*Powers of Appointment—The New York Revision* (1965) 65 Colum. L.Rev. 1289, 1291, fns. omitted.)

Thus, the more reasonable (and constitutional) interpretation of the second sentence of section 601 is that it was adopted to prevent retroactive application of that section to powers of appointment, and vested rights thereunder. This is because any rights a donee has in a will or trust vest at the time of the death of the donor, and subsequent legislation cannot impair such rights. (See *Estate of Wellings* (1925) 197 Cal. 189, 195 [240 P. 21]; *Estate of Thramm* (1947) 80 Cal.App.2d 756, 766 [183 P.2d 97].) At the time of Grandfather's death, Father was given a life estate and, because the power of appointment under the law then in place was "nonexclusive," all of Father's heirs were entitled, upon his death, to at least a "substantial" share of the estate.

Defendants assert that the CPAA and, in particular, sections 601 and 652, do not apply retroactively. They assert that section 652, with its presumption of "exclusive" power of appointment unless otherwise expressed, controls because this was the law at the time of Father's *exercise* of his appointment. However, section 652 governs the *creation* of a power of appointment, not the *exercise* of one. Section 601, which applies the law at the time of an *exercise* to that act, does not impact the original *creation* of the power of appointment. As the Law Revision Commission noted in its comments to Civil Code section 1380.2 (now Prob. Code, § 601), that section "deals only with the . . . 'exercise' of a power" and "does not deal with 'creation' of powers of appointment." (9 CLRC, *supra*, at p. 312.)

There were various provisions of the CPAA in effect at the time of Father's exercise that governed how he could properly effectuate that act: (1) he must have attained the age of majority and to have had legal capacity (§ 625); (2) he must have exercised the power by will because that is what Grandfather's will required (§ 630, subd. (a)); (3) he could not exercise the power through a general residuary clause without compliance with the CPAA (§ 641); and (4) his exercise must conform to all the conditions on the exercise of that power expressed in the will (§ 630, subd. (a)).

In asserting that the CPAA does not apply retroactively, defendants rely on *Kizer v. Hanna* (1989) 48 Cal.3d 1 [255 Cal.Rptr. 412, 767 P.2d 679] (*Kizer*) and *Yoshioka v. Superior Court* (1997) 58 Cal.App.4th 972 [68 Cal.Rptr.2d 553] (*Yoshioka*). However, neither case supports their position.

■ In *Kizer*, the California Supreme Court examined the constitutionality of a statute that allowed the State Department of Health Services to recover from a decedent's estate Medi-Cal benefits paid to the decedent during life. The statute allowed recovery of benefits paid *before* its effective date, but only where the recipient/decedent died *after* the statute's effective date. (*Kizer, supra,* 48 Cal.3d at p. 3.) There, the California Supreme Court held that "[a] statute is retroactive if it substantially changes the legal effect of past events." (*Id.* at p. 7.) Because the statute at issue applied only to decedents who died after its effective date, our high court concluded the statute "does not substantially change the legal effect of past transactions, even when applied to benefits received prior to its effective date" and, thus, "does not have a retroactive effect." (*Id.* at p. 8.)

Here, the opposite is true. The second sentence of section 601 does not alter the validity of a power created before the CPAA's effective date even if the power was not exercised until *after* the act's effective date. Because the question of whether Grandfather's power is nonexclusive or exclusive is governed by the creating instrument that became irrevocable upon his death, the nature of the power is determined by no later than the date of his death. If section 652, subdivision (a) is applied to make Grandfather's power exclusive, even though the law in effect at the power's time of creation made it nonexclusive, then section 652, subdivision (a) would substantially change the legal effect of *past* events. Thus, unlike the statute in *Kizer*, this would be a retroactive application of the CPAA.

■ *Yoshioka* addressed an initiative that barred uninsured motorists and drunk drivers from collecting noneconomic damages in connection with suits arising out of the operation of a motor vehicle. The initiative, which passed in November 1996, provided that it " 'shall be effective immediately upon its adoption by the voters. Its provisions shall apply to all actions in which the initial trial has not commenced prior to January 1, 1997.' " (*Yoshioka, supra,* 58 Cal.App.4th at p. 979, italics omitted.) The court reviewed the initiative under the doctrine of "secondary retroactivity," which occurs when the retroactive application of a law " ' "affect[s] the future legal consequences of past transactions." ' " (*Ibid.*, italics omitted) As the court noted there, secondary retroactivity " 'does not itself offend any laws, including the United States and California Constitutions.' " (*Id.* at pp. 979–980, fn. omitted.) In *Yoshioka*, the Court of Appeal held that the initiative did not violate due process because, although it limited the damages the plaintiff could recover, it

did not deprive him "of every reasonable method of securing just compensation." (*Id.* at p. 982, italics omitted.)

*Yoshioka* is also not controlling authority. As discussed, *ante*, this is not a case where past acts have consequences that cannot be determined until the future. Grandfather died in 1966, at which point the consequence of his creating instrument must be determined to have created a nonexclusive or exclusive power. The consequence of Grandfather's act was thus set in 1966.

Defendants also question whether Thomas Jr. (and Harley and Laurie) had any vested rights at the time of Grandfather's death. However, as stated, *ante*, their rights "vested" at the time of Grandfather's death. (*Estate of Thramm*, *supra*, 80 Cal.App.2d at pp. 765–766.)

Laurie cites *In re Marriage of Bouquet* (1976) 16 Cal.3d 583 [128 Cal.Rptr. 427, 546 P.2d 1371] (*Bouquet*) for the proposition that retroactive application of a statute is not per se unconstitutional even where it impairs vested rights. However, in that case the former California law provided that when spouses lived apart, the wife's earnings were her separate property, but the husband's remained community property. While their divorce was pending, the Legislature amended the Family Code to provide that the earnings of *both* husband and wife under such circumstances would be considered separate property. (*Id.* at p. 586.) The California Supreme Court held that the statute should be applied retroactively and that in that case "such application does not constitute an unconstitutional deprivation of the wife's property." (*Ibid.*) The court so held because the former statute "blatantly discriminated against the husband during periods of separation." (*Id.* at p. 588.) The high court there held that retroactive application of changes to community property law was not unconstitutional because the vested rights " 'derive from manifestly unfair laws,' " and the amendment was designed to "cure a rank injustice in the former law." (*In re Marriage of Lachenmyer* (1985) 174 Cal.App.3d 558, 562, 563 [220 Cal.Rptr. 76].)

██ *Bouquet* also identified several factors to consider in determining if retroactive application of a statute to vested rights should be considered constitutional: "In determining whether a retroactive law contravenes the due process clause, we consider such factors as the significance of the state interest served by the law, the importance of the retroactive application of the law to the effectuation of that interest, the extent of reliance upon the former law, the legitimacy of that reliance, the extent of actions taken on the basis of that reliance, and the extent to which the retroactive application of the new law would disrupt those actions." (*Bouquet, supra*, 16 Cal.3d at p. 592.) Consideration of these factors applied to this case demonstrate that applying section 652 retroactively to vested rights would be unconstitutional: (1) The

significance of the state interest served by section 652 is not great as it represents only a change in preference for one presumption over another, either of which could be overcome by the donor's use of contrary express language; (2) that interest is fairly served by not applying it to powers created by donors who died before the new statute went into effect and thus had no reason to alter their powers before their deaths; (3) the former law had been the law of California since 1935; (4) as the former law was the result of a court decision that was based on an interpretation of common law that had never been challenged or questioned in California for many years thereafter (until enactment of the CPAA in 1969), reliance on the prior law was legitimate; (5) anyone who drafted or executed a power of appointment before enactment of the CPAA would have acted in reliance on *Estate of Sloan*; and (6) as to donors who died before passage of the CPAA in 1969, retroactive application of section 652 would defeat their testamentary intent and estate plans.

### D.  *The* Estate of Sloan *"Substantial" Portion Language*

Defendants assert that even if *Estate of Sloan* was the law at the time Grandfather executed his will, the term "substantial" used in that case to describe a minimum amount that each appointee of a nonexclusive power must receive is too vague a term for Grandfather to have intended it to apply to his will. However, in a law review article published nine years after *Estate of Sloan*, the author's review of all cases analyzing "substantial" as opposed to "illusory" appointments determined that there was a relatively narrow range as to what courts found to be "substantial" versus "illusory." (Howe, *Exclusive and Nonexclusive Powers and the Illusory Appointment* (1944) 42 Mich. L.Rev. 649, 672–674.) Further, another law review article written between the time Grandfather's Will was executed and when he passed away explained why an estate planner may choose to use the term "substantial" in a nonexclusive power of appointment: "The estate planner should determine whether his client wants to create a power which is 'exclusive' or 'nonexclusive' and, if the latter, what minimum benefit must be conferred on each member of the group designated as objects. . . . Although this type of minimum benefit could be expressed as a percentage of the fund or in terms of a sliding scale rather than a set amount, it is conceivable that the donor might prefer to leave to the donee and the court only the vague direction that all objects receive 'substantial' gifts, to be interpreted in light of subsequent circumstances such as the size of the fund and the current cost of living." (Halbach, Jr., *The Use of Powers of Appointment in Estate Planning* (1960) 45 Iowa L.Rev. 691, 714–715.)

Additionally, while defendants assert that use of the term "substantial" invites litigation, there are no reported decisions in California in which a person questioned whether a particular appointment was sufficient to be considered "substantial."

Defendants, moreover, go to great lengths in their briefs asserting that the Legislature was right to change the nonexclusive presumption existing under *Estate of Sloan* to a presumption of exclusive appointment in section 652 because *it is the better and more precise rule.* However, the issue before this court is not which presumption is *better* or more well reasoned. The question, which we have answered in the affirmative, is whether the second sentence in section 601 upheld a testator's intent to make a power of appointment nonexclusive under the law existing at the time the power was created.

### III. *STATUTE OF LIMITATIONS DEFENSE*

Because the court sustained defendants' demurrer on the basis that section 652 controlled and that made Grandfather's power of appointment exclusive, it did not decide defendants' statute of limitations defense. Defendants renew their statute of limitations defense on appeal. We conclude that Thomas Jr.'s case was timely filed.

Laurie asserts that the one-year statute of limitations contained in Code of Civil Procedure section 366.2 applies, which provides: "If a person against whom an action may be brought on a liability of the person, whether arising in contract, tort, or otherwise, and whether accrued or not accrued, dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced within one year after the date of death, and the limitations period that would have been applicable does not apply." (*Id.*, subd. (a).)

However, this statute has no application here because (1) Thomas Jr.'s action is not a claim for personal liability of Father, and (2) it could not be filed before his death. *Estate of Yool* (2007) 151 Cal.App.4th 867 [60 Cal.Rptr.3d 526] is instructive. There, real property was held in the decedent's name as an accommodation to facilitate financing for her daughter's benefit. The decedent gave no consideration for the property and never intended to take beneficial title. The daughter brought a section 850 petition for delivery of the property to her, which the court granted, imposing a resulting trust on the property. (*Estate of Yool, supra,* at pp. 870–871.) In doing so, the court held that Code of Civil Procedure section 366.2 did not apply because it only applied to a " 'liability of the person' " and because a trustee "holds title, *but does not own* the property in question, there is no issue of personal liability or resort to the trustee's assets." (*Estate of Yool,*

*supra*, at p. 875.) The court also noted that at the time of the decedent's death there was not yet a cause of action for a resulting trust and Code of Civil Procedure section 366.2 "specifically contemplates an action that may be brought against a person prior to his or her death." (*Estate of Yool, supra*, at p. 876.)

Likewise, in this case Thomas Jr. is not seeking to impose any personal liability against Father or make a claim against his assets. Also, he could not have brought a claim against Father before his death because Father could have changed his will at any time until he passed away. Accordingly, Code of Civil Procedure section 366.2 does not apply.

Laurie asserts that *Estate of Yool* does not apply, but rather the statute of limitations question is governed by *Battuello v. Battuello* (1998) 64 Cal.App.4th 842 [75 Cal.Rptr.2d 548], wherein a son brought an action for breach of promise to make a will to leave him certain property, and the decedent instead executed a trust with his wife that did not give the son the property. (*Id.* at p. 845.) The son argued that Code of Civil Procedure section 366.2 did not apply to his claim for breach of contract to make a will because "such a cause of action does not come into existence until after the promisor has died . . . ." (*Battuello v. Battuello, supra*, at p. 846.) The Court of Appeal rejected this argument because the promisor in that case "made an inter vivos transfer of [the] property specifically covered by the contract. . . . In that situation, the promisee may seek equitable relief . . . during the promisor's lifetime." (*Ibid.*, citations omitted.)

Here, however, there was no inter vivos transfer during Father's lifetime, and therefore Thomas Jr. had no claim against Father before his death.

Harley, for the first time on appeal, argues that the three-year limitations period for a breach of trust found in section 16460 applies. However, Father was made both the trustee of Grandfather's trust and the donee of Grandfather's power of appointment. As trustee, Father was tasked with managing the net income of the Trust during his lifetime. As donee, he was given a power of appointment to appoint three quarters of the estate through his will. Thomas Jr.'s claim is not based upon any violation of his duties as trustee, but rather his exercise of the power of appointment in his capacity as donee. Thus, Thomas Jr.'s claim is not barred by the three-year limitations period contained in section 16460.

## IV.   *LACHES*

Harley asserts that this court should conclude that if Thomas Jr.'s claims are not barred by the statute of limitations, they should be barred by the doctrine of laches. This contention is unavailing.

█ Because this case was dismissed at the pleading stage, Harley's laches defense is not properly considered on this appeal. "Laches requires an unreasonable delay in asserting a claim resulting in prejudice to the party against whom the claim is asserted." (*Quick v. Pearson* (2010) 186 Cal.App.4th 371, 379 [112 Cal.Rptr.3d 62].) Because this defense is inherently factual, both as to the question of the unreasonableness of Thomas Jr.'s delay, and as to the question of prejudice to defendants, we cannot resolve it at the pleading stage.

## V. *REMEDY*

Thomas Jr. asserts that the proper remedy for Father's defective power of appointment is governed by section 672, which provides: "(a) Except as provided in subdivision (b), if the donee of a discretionary power of appointment fails to appoint the property, releases the entire power, or makes an ineffective appointment, in whole or in part, the appointive property not effectively appointed passes to the person named by the donor as taker in default or, if there is none, reverts to the donor. [¶] (b) If the donee of a general power of appointment makes an ineffective appointment, an implied alternative appointment to the donee's estate may be found if the donee has manifested an intent that the appointive property be disposed of as property of the donee rather than as in default of appointment."

Defendants, on the other hand, assert that section 670 controls, which provides: "An exercise of a power of appointment is not void solely because it is more extensive than authorized by the power, but is valid to the extent that the exercise was permissible under the terms of the power."

Under his analysis of section 672, Thomas Jr. asserts that he should be entitled to a division of the appointive property equally with his siblings, Harley and Laurie. Defendants on the other hand assert that if Father's power of appointment was ineffectual, it is governed by section 670 and under that section, Thomas, Jr.'s share would be a "substantial" share, as he has sought in his petition under the rule enunciated by *Estate of Sloan.*

We conclude that because Thomas, Jr.'s claim is based upon the common law rule enunciated in *Estate of Sloan,* we shall remand this case for a determination of what constitutes a "substantial" share of the estate.

## DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings consistent with this opinion. Thomas Jr. shall recover his costs on appeal.

McConnell, P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied June 20, 2012, and the petitions of appellant and both respondents for review by the Supreme Court were denied August 22, 2012, S203887. Baxter, J., did not participate therein.