Filed 3/27/15  Lucas v. Lilienthal CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THOMAS A. LUCAS AS TRUSTEE, etc.<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PETER LILIENTHAL,<br><br>    Defendant and Appellant. | A139925<br><br>(San Francisco County<br>Super. Ct. No. PTR11295184) |

A long married couple executed their estate plan in 1984, a plan that, assuming they survived their parents, would ultimately benefit their two adult sons, James and Peter.  The surviving wife died in 2008, the upshot of which was the distribution of the $900,000-plus in assets that had been held in her trust, to be distributed 50 percent outright to Peter and 50 percent in trust for James.  A licensed professional fiduciary became the successor independent trustee of that trust for James, and filed a petition seeking to confirm the discretionary standard under which he was to distribute funds to James.  Peter filed opposition.  The petition was heard by an experienced probate court judge who issued her statement of decision confirming that the trustee was appropriately exercising his discretion—that the trust did not require him to consider resources outside of the trust before making distributions.  Peter appeals.  We affirm.

**BACKGROUND**

**The Parties**

Robert P. Lilienthal (Robert) was a fourth generation Californian, and a longtime San Francisco community leader.  He was married to Frances Newman Lilienthal

1

(Frances) for some 60 years, and they had two children, James, born in 1941, and Peter, born in 1946. Robert died in 1998, at age 84. Frances died in 2008, triggering the termination of their estate plan—and ultimately giving rise to the issue here.

**The Plan and the Distributions**

In 1984, Robert and Frances established their estate plan, prepared by attorney Alvin Pelavin, a member of Pelavin, Norberg, Harlick & Beck. The plan consisted of mirror-image wills which created a testamentary trust and some other trusts for the survivor. Mr. Pelavin left his firm to join Cooper, White & Cooper, and took the estate planning file with him. Peter Muhs, an attorney at the Cooper firm, later became the Lilienthals' estate planning attorney.

The estate plan was apparently revised from time to time, the last time in 1996. The will signed by Robert that year is not in the record, but what is in the record is the "Decree of Final Distribution on Waiver of Account and Allowing Compensation" in the Estate of Robert P. Lilienthal, San Francisco Superior Court Case No. 269944, filed March 4, 1999 (Decree of Final Distribution). The Decree of Final Distribution described that Robert's will left his estate in two shares: one for his surviving spouse, Frances, and the other for the benefit of Frances during her lifetime and then for the benefit of his two sons, Peter and James.

The Decree of Final Distribution ordered outright distribution to Frances of $264,820 in cash and $1,058,644 in securities. It also directed distribution of a 36.878 percent interest in the Lilienthal residence (the residence) to Frances as trustee of a trust (the Exemption Trust).[1]

As noted, Frances died in 2008. After her death, the residence was sold. James and Peter, as trustees of Frances's living trust, sold the 63.122 percent interest not held in the Exemption Trust and received $1,830,422.78 in sales proceeds. Those proceeds,

---

[1] This trust is referred to as the Exemption Trust, based on the federal estate tax exemption. In 1998, the year of Robert's death, the federal estate tax exemption amount was $625,000 (Int.Rev. Code, § 2010), and it appears that 36.878 percent shares of the residence was worth $625,000.

together with Frances's other assets, were distributed outright to James and Peter through Frances's living trust. The record does not reflect the total amount distributed to Peter and James beyond the $1,830,422.78 from the sale of the residence. What we do know is that the parties' briefs refer to both Peter and James as "multi-millionaires," a description neither brother disputes.

Upon the death of Frances, the Exemption Trust was to be divided into two equal shares, one share to be distributed outright, and free of further trust, to Peter, the other share to be held in a trust for the benefit of James (the James Trust).[2] Peter, the then-trustee of the Exemption Trust, sold the 36.878 percent interest in the residence, and the Exemption Trust received $1,069,394.69 in sales proceeds. Peter distributed his $469,349.32 share to himself on February 19, 2012. He did not immediately distribute James's share, however, perhaps because there was no trustee to whom to distribute it.

**James's Petition**

The estate plan required that the James Trust have both a family trustee and an independent trustee, and in the event of a vacancy in the latter office, the family trustee was empowered to appoint the independent trustee. The office of independent trustee was vacant by reason of the declinations of Walter S. Newman and John Newman to serve as independent trustee; and Peter and his wife Sara Moniot declined to serve as family trustee. Therefore, under the terms of the Decree of Final Distribution, the next successor family trustee was James.

On July 12, 2012, James filed a petition styled to "Confirm Current Vacancy in the Office of Independent Trustee, to Confirm Petitioner as Family Trustee, and to Appoint Professional Fiduciary Thomas Lucas to Serve as Independent Trustee." The petition went on to request five items, including that the court "instruct Peter . . . as Successor Trustee of the Testamentary Exemption Trust to fund the" James Trust.

---

[2] We refer to this trust as the "James Trust," the shorthand term used by the probate court and in Lucas's respondent's brief.

3

On September 5, Peter filed a response with several exhibits, including a letter from his counsel that, as his response put it, indicates "there is no dispute" between James and Peter "concerning the relief requested in the Petition." But on September 11, Peter filed a supplemental response, which led to a reply from James, which reply confirmed that among the requested items in James's petition was the request that Peter "fund the [James Trust]."

The petition came on for hearing on October 1, 2012 before the Honorable Peter Busch. On October 3, Judge Busch signed an order appointing Thomas Lucas as the Independent Trustee of the James Trust. Meanwhile, the court mini-minutes of October 1 indicate that Peter had distributed to Lucas $350,000 on October 1, 2012. Peter thereafter distributed $77,673.11 in January 2013, for a total of $427,673.11.[3]

That, then, is the setting as of early 2013: two brothers, James, aged 72, single and never married, and Peter, aged 67, married with one daughter; both, according to uncontradicted descriptions in the record, "multimillionaires"; and, whatever their relationship while their parents were alive, now apparently disagreeing about many things. Put otherwise, while the relationship between the brothers before Frances died is unknown from this record, there were certainly some issues between them after her death.[4]

---

[3] The difference in the distribution amounts—$469,342 to Peter in February 2012 and the total of $427,673 to the James Trust in the two payments—resulted from the probate court allowing one-half of Peter's attorney's fees and 100 percent of Peter's trustees fees to be paid from the James Trust.

[4] Peter's opening brief contains a section entitled "Background and Necessary Context," included within which are references to various petitions made, and correspondence written, before the petition giving rise to the issue here. Lucas's respondent's brief calls Peter's mention of all this inappropriate. We need not comment on this one way or the other, except to note that it reflects the apparent tension, if not acrimony, between the brothers.

4

**Lucas's Petition**

On January 29, 2013, Lucas filed a petition for interpretation of trust. The petition was brief, less than seven pages long, and signed under penalty of perjury. The petition repeated the pertinent terms of the pertinent trust, and then set forth Lucas's interpretation of the trust and why the petition was being filed, as follows: "It is the Trustee's interpretation of the Trust that he has the sole discretion to pay or apply for the benefit of James as much of the income and principal of the Trust for his care, maintenance, support and education. James has expressed interest in traveling to study abroad and the Trustee believes under the terms and the intent of the settlor this is appropriate. Further it is the Trustee's interpretation that he does not need to give consideration to all other income and resources available to James beyond confirming that James has sufficient other resources, apart from the Trust, to meet his on-going support needs. In other words, that the Petitioner has the discretion to use the Trust for James's education and other needs provided that James has sufficient other resources outside of the Trust to meet his support needs for the balance of his life. Petitioner is seeking a determination of this Court that his interpretation of the Trust is accurate."

Lucas's petition then set forth what he perceived to be some applicable legal principles and his perception of his role under the trust, went on to refer to an "indicat[ion]" of Peter's interpretation based on a pleading filed by Peter, and in its penultimate paragraph "invites both Peter and James to provide further information that may evidence their father's intent." Lucas's petition ended with this request:

"**WHEREFORE**, the Petitioner requests an Order of this Court that he as trustee of the Trust f/b/o James Lilienthal does not need to take into account James Lilienthal's other income and resources when making a determination to pay as much of the income and principal from the Trust for James's care, maintenance, support and education provided that James's assets exclusive of the Trust appear to be sufficient in the Petitioner's judgment to meet James's support needs for the balance of his life; and granting such other relief as the Court considers proper under the circumstances."

5

On May 2, Peter filed his response to the petition, a response that was three times as long as the petition, the substance of which will be discussed below in connection with the issue to which it pertains. The response was accompanied by a six-page declaration of Attorney Muhs, which attached, and purported to authenticate, four exhibits totaling some 62 pages. However inappropriately, Mr. Muhs's declaration did not just recite facts, but attempted to urge and argue positions. (See *In re Marriage of Heggie* (2002) 99 Cal.App.4th 28, 30, fn. 3 ["The proper place for argument is in points and authorities, not declarations."].) His declaration also attached what he called a "rough draft" of a 1984 instrument, as well as two pages of notes Mr. Muhs made in a 1990 meeting. (See *Hayman v. Block* (1986) 176 Cal.App.3d 629, 638–639.) Peter's response also requested attorney fees.

Peter's response generated Lucas's supplement to his petition, filed on May 15 and a supplement of "Beneficiary James Lilienthal," filed on May 21.

Not to be outdone, on May 22, Peter filed his supplement to response which, among other things, asserted that professional fiduciary Lucas "has not been candid with the Court." The next day Peter filed his second supplement to response. Peter's supplement also requested a statement of decision, which went on to request the statement address six "controverted issues."

All told, the papers before the probate court on Lucas's seven-page petition totaled over 120 pages.

The petition came on for hearing on May 28, before the Honorable Mary Wiss, an experienced probate court judge. Judge Wiss heard extensive argument, in the course of which she engaged counsel with pointed questions. Following that, Judge Wiss took the matter under submission

On June 26, Judge Wiss issued her proposed statement of decision, which found that "James's one-half of [the Exemption Trust] is for his use. Nothing in the documents presented to the Court hints at a hidden intent by Robert that James's trust is required to be preserved for James's heirs or for Peter or Peter's issue. Rather, in the sole discretion of the successor trustee, the funds may be used for James's benefit. Nothing in the trust

6

documents requires the successor trustee to consider other assets or resources. No evidence has been presented which persuades the Court that Robert intended that James's Trust be used only after exhaustion of his other resources."

And Judge Wiss concluded: "Any decision by the successor trustee to expend income or principal or the amount of such expenditure is in the sole and absolute discretion of the successor trustee. The successor trustee need not take into account James's other income and resources when making a determination to pay as much of the income and principal from the Trust for James's care, maintenance, support and education, when James's assets, exclusive of the Trust, appear to be sufficient in successor trustee's judgment to meet James's support needs for the balance of his life." And: "Respondent's claim for attorney fees is denied."

On July 11, Peter submitted objections to the proposed statement of decision. He listed 12 specific objections, most of which were merely rearguments of various of Peter's arguments that Judge Wiss had rejected.

On August 5, Judge Wiss filed her final statement of decision. It was a comprehensive, thoughtful, 11-page statement that explained in detail the bases for her conclusion, which concluded with this "Order": "The successor trustee has the sole and absolute discretion to expend income or principal from James's trust for James's care, maintenance, support, and education, and need not take into account James's other income or resources. In exercising his discretion, the successor trustee may consider whether James's assets, exclusive of the trust, appear to be sufficient in successor trustee's judgment to meet James's support needs for the balance of his life."

Peter filed a timely notice of appeal. (See Prob. Code, § 1304, subd. (a) [any final order under Probate Code section 17200 appealable].)

### PETER'S CONTENTIONS ON APPEAL

Peter makes three contentions on appeal, one essentially procedural and two substantive, that Judge Wiss erred in: (1) prematurely ruling on Lucas's petition; (2) ruling that Lucas may make distributions without regard to James's other assets or income; and (3) denying Peter's request for attorney fees.

7

## DISCUSSION

### The Petition Was Proper

Peter's first argument on appeal is that the petition was premature. We easily reject the argument.

By way of background, Peter's response below objected to Lucas's petition on several grounds. As pertinent to the prematurity argument, Peter's response—as described in his brief here—made these objections:

"1. The petition was not ripe for a decision. It concerned possible distributions from the trust, in unknown amounts, for 'educational travel' but did not present an actual request from the beneficiary for any particular amount of distribution.

"2. It was necessary for the Court to have details concerning the amount requested, the current assets of the trust, the current income of the trust, James's current and projected future expenses and the ability of his resources outside of the trust to meet those expenses; and the impact of such expenditures on the ability of the trust to provide support for James for the remainder of his lifetime should he ever find himself in need."

Judge Wiss rejected the argument without discussion. We reject it as well, with brief discussion.

Probate Code section 17200—not incidentally, a section relied upon by Lucas and ignored in Peter's reply brief—provides in pertinent part as follows: "(a) Except as provided in Section 15800, a trustee or beneficiary of a trust may petition the court under this chapter concerning the internal affairs of the trust or to determine the existence of the trust. [¶] (b) Proceedings concerning the internal affairs of a trust include, but are not limited to, proceedings for any of the following purposes: [¶] (1) Determining questions of construction of a trust instrument."

Lucas's petition manifestly comes within this section, seeking, as it did, "construction of a trust instrument." (See generally *Estate of Bullock* (1968) 264 Cal.App.2d 197, 200–201.) As Lucas explained, "Because James has assets of his own outside of the Trust, a situation which his parents appear not to have anticipated, . . .

8

[Trustee] is seeking an interpretation of the trust language to guide him as to when he may comply, rather than deny, a request."

And Lucas sought such guidance for good reason, as he also explained: "This Court is well aware of the lengthy and costly litigation which has already occurred in these proceedings. Petitioner currently finds himself in the situation that, if he takes no action, that is, makes no distributions to James, he invites litigation from James for violating the terms of the trust. On the other hand, if he does make distributions to James while James has other assets, the Response suggests that he should expect litigation from Peter. If the Court provides the requested interpretation, all the parties will be aware of the standard under which Petitioner is to exercise his discretion as trustee."

Or, as Lucas put it at a later point, "Returning to Court for instructions for every distribution, rather than determining an interpretation at this time, is uneconomical for both the Trust and this Court. The Trust is relatively small, with a current fair market value of approximately $420,000, and it has already paid significant attorneys' fees. Petitioner believes that both Peter and James have also personally incurred significant attorneys' fees in this matter, as well as suffering the emotional stress of the ongoing litigation. Rather than filing individual petitions for each requested expenditure, Petitioner has requested an interpretation in order to provide him with a standard for exercising his discretion. Once provided, Petitioner can go about his duties as trustees normally do, exercising his discretion without returning to the Court for every proposed distribution."

In short, Lucas sought to minimize conflict regarding the James Trust, not encourage it, and so sought an overall interpretation of the James Trust rather than a petition for instructions for a specific expenditure. This was proper.

Ignoring all that, Peter's argument here asserts only this, with all italics as in Peter's brief:

"*Scott and Ascher on Trusts* § 116.8 [*sic*] (5th ed. 2006) states in pertinent part, as follows:

9

" 'There are situations . . . in which the courts do not give instructions. The courts do not give instructions when there is no reasonable doubt as to the trustee's duties and powers. *The courts do not ordinarily instruct a trustee as to questions upon which the trustee's present conduct does not depend, such as those that have not arisen or may never arise. The courts do not advise a trustee how to exercise a discretionary power.*'

"California law is in accord. A trustee seeking attorneys' fees for initiating litigation has the burden of proving that the litigation was necessary for the proper administration of the trust. (See *Security-First Nat. Bank v. Tracy*, 21 Cal.2d 652 (1943).)

"As stated in *California Trust Administration* § 15.28:

"The Trust Law is not intended to change the general rule that the court will not substitute its judgment for that of the trustee . . . . When the trustee is unsure about the propriety of making or denying a discretionary distribution, it is appropriate to petition the court for instructions. *The petition should state all pertinent facts* and may present all points of view through declarations of the trustee or beneficiaries. This protects the resulting court order from collateral attack for fraud or malfeasance. *In contrast to most petitions for instructions, the trustee should not state a preferred course of action in a proposed order because this would likely violate the impartiality of the trustee. Instead, the trustee should present both arguments as equally valid and let the court decide.*"

Peter's authorities are not persuasive. We do not understand how the musings of two commentaries about what may "ordinarily" occur or not occur in probate court, or what a trustee "should state" in a petition if he or she is "unsure" of something has any application here, especially in light of the fact that an experienced probate law judge thought Lucas's petition appropriate. Nor do we understand how the short (one and one-half page) decision in *Security-First Nat. Bank v. Tracy, supra*, 21 Cal.2d 652, supports Peter, especially in light of the actual holding of the Supreme Court, which was this: "The trustee, at the time this proceeding was commenced, was faced with conflicting demands threatening a possible double liability. It was entitled to judicial instructions as to its duties under the trust agreement." (*Id.* at p. 654.)

10

**Judge Wiss's Decision On the Petition Was Correct**

Peter next contends that Judge Wiss's conclusion as to the meaning of the James Trust was error, a decision we review de novo. (*Estate of Gross* (1963) 216 Cal.App.2d 563, 566 (*Gross*).)

Probate Code section 21102, subdivision (a)—another section relied on by Lucas, another section ignored in Peter's reply—mandates that "the intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument." We thus begin with that instrument.

Section 6.3.1 of the James Trust provides as follows: "The Independent trustee shall pay to or apply for the benefit of JAMES R. LILIENTHAL as much of the income and principal of the trust as is necessary to provide for his and his spouse and issue's care, maintenance, support and education. In addition and at the request of JAMES R. LILIENTHAL, the independent trustee in the independent trustee's absolute discretion may expend a portion of the principal of this trust to purchase all or make a down payment on a residence for the use of JAMES R. LILIENTHAL and his family. Any decision to expend income or principal or the amount of such expenditure under this decree shall be in the sole and absolute discretion of the independent trustee, and the family trustee, if one is serving, shall take no part in any such decision."

As indicated from the above—and as Judge Wiss specifically noted—there is no language in this section that the trustee must take into account other assets. Rather, it directs the trustee to provide for James's care, maintenance, support, and education without qualification, and it allows, the trustee to pay or apply as much of the income and principal of the trust in the trustee's "sole and absolute discretion." Put conversely, nowhere does the trust restrict the trustee from making any distribution without taking into account James's other assets.

Peter claims the phrase "as is necessary" means that the trustee must take into consideration James's other income and resources before making any distributions from the James Trust. Peter is mistaken.

To begin with, paragraph 6.3.1 simply does not say that.

11

Second, Peter's contention is inconsistent with the usual understanding. As the leading commentary notes, "When the terms of the trust require the trustee to pay to or apply for the beneficiary so much *as is necessary* for maintenance or support, but fail to provide whether the trustee is to take into account the beneficiary's other resources, . . . . [m]any cases, as well as the Restatement (Second) of Trusts, have concluded that the usual inference ought to be that the settlor intended for the beneficiary to receive support, even if the beneficiary has other resources." (3 Scott and Asher on Trusts, *supra,* § 13.2.4, p. 828, fn. omitted, italics added.)

Third, and most significantly, the language of paragraph 6.3.1 is different from other provisions in the estate plan, which provisions do expressly say that. For example:

The Exemption Trust provided that all income was to be paid to Frances, with the principal to be paid for her support, maintenance, and care, "*giving consideration to all other income and resources known to the trustee then readily available for her to use for such purposes.*" (Italics added.)

Similarly, upon the death of Frances, the Exemption Trust was to be divided into two equal shares, one for Peter and one for James. If Peter survived, his one-half was to be distributed to him outright, but if he did not survive, but left a spouse, then his share was to be held in trust for his spouse pursuant to paragraph 6.2. That paragraph provides for use of income and principal and, as pertinent here, provides that "At such time or times the independent trustee may pay to, or apply for the benefit of, the beneficiary or any of them as much of the net income or principal of the trust as the independent trustee deems advisable and proper for any of said purposes, *giving such consideration as the independent trustee deems proper to all other income and resources then readily available to the beneficiary for use of such purposes . . . .*" (§ 6.2.1, italics added.)

As indicated, paragraph 6.3 provided for the trust for James, and 6.3.1 addressed circumstances "during the life of James . . . ," which is what is involved here. Paragraph 6.3.2 addressed the circumstances in the event James predeceased Frances or died leaving a spouse and/or children. In those circumstances, "The trustee in the trustee's absolute discretion may use net income or principal of the trust when any

12

beneficiary is in need of funds to meet the reasonable expenses . . . . As such time or times the trustee may pay to, or apply for the benefit of, the beneficiary as much of the net income or principal of the trust as the trustee deems advisable and proper for any of said purposes, *giving such consideration as the trustee deems proper to all other income and resources then readily available to the beneficiary . . . .*"  (Italics added.)

In sum, the provision for which Lucas sought instructions here contained no language indicating the trustee had to take into account other assets.  At least three other trust provisions did.

The holding of our Division Three colleagues in *Gross, supra,* 216 Cal.App.2d 563 is persuasive.  The appeal there was by an income beneficiary of a trust, who appealed from an order denying her petition to require the trustees to sell certain trust property claimed by appellant to be unproductive of income.  The Court of Appeal affirmed.  After quoting from various provisions in the trust—which provisions, like those here, varied in their language—the Court of Appeal noted that "It seems apparent, therefore, that in some instances the trustor intended to confer upon his trustees ordinary discretion only, and in other instances he intended their discretion to be absolute." (*Gross, supra,* 216 Cal.App.2d at p. 567.)  Applying that difference in language, the court held that the trustee could refuse to do what he refused to do, analyzing the specific language of the trust.  That, of course, is precisely what Judge Wiss did here.  And properly so, especially in light of the settled rules of construction.

As noted, the transferor's intention as expressed in the instrument controls the disposition made by the instrument.  (Prob. Code, § 21102, subd. (a); *Newman v. Wells Fargo Bank, N.A.* (1996) 14 Cal.4th 126, 134; *Sefton v. Sefton* (2012) 206 Cal.App.4th 875, 884-885; *Estate of Cairns* (2010) 188 Cal.App.4th 937, 947–948.)  The words of the instrument are to be interpreted in a way that can give "every expression some effect," rather than one that will render any expression inoperative.  (Prob. Code, § 21220; *Estate of Goyette* (2004) 123 Cal.App.4th 67, 74; *Estate of Simoncini* (1991) 229 Cal.App.3d 881, 889.)  And all parts of the instrument are to be construed in relation to each other, to "form a consistent whole."  (Prob. Code, § 21121; *Newman v. Wells Fargo Bank, N.A.*

13

*supra,* 14 Cal.4th at p. 134; *Estate of Cairns, supra,* 188 Cal.App.4th at p. 948; *Estate of Simoncini, supra,* 229 Cal.App.3d at p. 889.)

Those rules demonstrate that Judge Wiss's decision was correct. So, too, the common understanding of the estate plan here.

Again, Scott is apt, with this observation: "Sometimes a testator leaves property in equal shares to several relatives but provides that one share is to be held in trust and that the trustee is to pay the income from that share to a particular relative. In such a case, the inference may be that the testator intended to treat each of the relatives alike, except to deny one of them the management and control of his or her share. The court may also infer that the testator did not intend to limit the particular relative's interest to a life interest. Language requiring the trustee to pay the income to the beneficiary or use it for the beneficiary's support or authorizing the trustee to use the principal as far as necessary for the beneficiary's support does not necessarily rebut an inference that the beneficiary has the entire beneficial interest." (3 Scott and Asher on Trusts, *supra,* § 13.2.2, pp. 822-823, fn. omitted.)

Were Lucas restricted from making distributions to James because, in fact, he has sufficient assets to support himself, James would not be treated equally as his brother Peter, who has received the full enjoyment of his inheritance. Conversely—and perversely—if Lucas can only make distributions to James that are necessary because he has exhausted his other assets, James could be encouraged to impoverish himself in order to obtain benefit from his Trust.

The James Trust provides in paragraph 6.3.4 that if James were to die without spouse or issue, the trust assets would go to Peter (or his issue).[5] But nowhere in the

---

[5] The significance of which did not escape comment at the hearing below, including this colloquy:

"MR. SKOOTSKY [Counsel for Peter]: And that brings me to another issue. We hear in the papers and we hear twice in counsel's presentation that the reason for kind of bypassing the normal approach that's used in these cases is because there's been lengthy and costly litigation between these siblings. And so—

14

record does it appear that the estate plan intended the principal of the James Trust to be preserved for the purpose of ensuring that a remainder existed in order to make an additional gift to Peter (or his daughter). In fact, the evidence is to the contrary: if James were to die with a spouse and/or issue, the principal was to remain in trust for their benefit until his spouse dies and his youngest child reaches the age of 25, and then is distributed outright to James's issue.

While we agree with Judge Wiss that Mr. Muhs's declaration should not be considered, we do have two observations about the last paragraph of his declaration, which said this: "During my meeting with counsel on April 27, 2013 I was asked to comment on the fact that the provisions of James's trust, effective during his lifetime, do not contain a specific direction to consider the beneficiaries' other resources before making distributions to James, his spouse and his issue, whereas the provisions of the James's trust, effective following the death of James, for the benefit of his spouse and issue do require consideration of their other resources. I don't have a specific

---

"THE COURT: In that regard, why does Peter care so much about whether the trustee approves an education expense for James?

"MR. SKOOTSKY: Your Honor, Peter Lilienthal is—his only concern here is that the wish of his father be upheld, that the trust be administered in accordance with his parents' wishes, or in this case his father's wishes. This trust—as we have pointed out, this trust makes provision for a spouse and for issue. And apparently James Lilienthal has been on a lengthy trip to Vietnam, and I think he's still there. And hypothetically if he has a girlfriend in Vietnam, and he marries her, and he's fully able to defeat Peter Lilienthal's wishes, and that would be okay with Peter, but that would be inconsistent with what the trust says and what his parents' wishes were.

"THE COURT: Does it have anything to do with the fact that he's the residuary beneficiary?

"MR. SKOOTSKY: Well, Your Honor, I can only answer, I would—I don't think that really has anything to do with why we're here today, I mean, what's before the Court. He is—it's almost silly to describe that as an important motivation of Peter Lilienthal. We're told that James Lilienthal has health problems. We're told he has cardiovascular disease, but not such that he can't have a long trip to Vietnam. And probably all of us, if we were tested, would have some degree of cardiovascular disease. So in other words, Peter has no expectation whatsoever that he's going to survive James. That's not a motivating factor at all."

15

recollection as to the reason for the difference in drafting, which was part of the terms of the 1984 Will, but as drafting attorney I don't believe that any difference was intended, in view of the purpose of the trust as set forth above, and in view of the fact that James's spouse and issue are beneficiaries both during James's lifetime (through James) and thereafter."

First, Mr. Muhs is a State Bar certified estate planner, whose declaration acknowledges that the "difference in drafting" had been part of the estate plan since 1984. We would assume that a certified estate planner knows that such "difference in drafting" must be given effect as, for example, *Gross* holds. Second, if the intent of his client(s) was as Mr. Muhs would have it, presumably such planner would have observed the different provisions—and made the paragraphs consistent. What we do know is that Mr. Pelavin, the attorney who drafted the provisions (later apparently copied by Mr. Muhs) deliberately chose to use different language. The only reasonable interpretation is that Robert intended the tests to be different.

Peter relies primarily on two cases, cases his reply brief describe as "binding Supreme Court precedent": *Estate of Ferrall* (1953) 41 Cal.2d 166 (*Ferrall*), and *Thomas v. Gustafson* (2006) 141 Cal.App.4th 34 (*Gustafson*). As Peter would have it, "*Ferrall* sets forth a presumption ('*Ferrall* presumption') that the resources available to a beneficiary outside of the trust must be taken into account by a trustee in the exercise of the trustee's discretionary power to make distributions." Hardly.

As to *Ferrall,* it is probably enough to quote its holding as distilled by *Gustafson*: "A trustee should consider a beneficiary's other resources before making a distribution of principal, unless the trust instrument itself shows another intent. (*Estate of Ferrall* (1953) 41 Cal.2d 166, 176–177." (*Gustafson, supra,* 141 Cal.App.4th at p. 41.) Here, as demonstrated above, the trust instrument "shows another intent."

As to *Gustafson,* Judge Wiss found the case "easily distinguishable." We cannot improve much on her description of why, and we quote it here: "[T]he facts of *Gustafson* are easily distinguishable. In *Gustafson* the decedent had a trust which provided that, upon his death, the trust was divided between a survivor's trust and a residual trust.

16

Decedent had no children. His wife had one child by a prior marriage. The trial court found that the wife's survivor's trust was intended to go to her daughter and the residual was to go to the decedent's heirs. The wife, as trustee, and subsequently her daughter as successor trustee, used the entirety of the survivor's trust to purchase and renovate a building and then gifted the building to the wife and daughter as joint tenants. Once the survivor's trust was exhausted, the daughter looked to the residual trust to support her mother's care expenses. The trust document provided that the wife was entitled to support from the *income* of the survivor's trust, and then the residual trust. If the *income* of the two trusts was insufficient for her support then the *principal* of the survivor's trust was to be used followed by the *principal* of the residual trust. The trust provided that the trustee shall pay for the benefit of the spouse, such sums out of the principal of the trusts "as are necessary". The question before the trial court was whether the wife was entitled to support from the principal of the residual trust when the building was still available to her for her support. The trial court held that the assets of the building which should have been in the survivor's trust were to be used first before resorting to the principal of the residual trust. The Court of Appeal affirmed. Peter argues that the phrase 'as necessary' therefore implies that in the case before us that the successor trustee must consider James's other assets. [¶] The same considerations are not present here."

**Denial of Attorney Fees Was Proper**

Peter sought attorney fees below, which Judge Wiss denied on the basis that Peter had vindicated no right, but instead only opposed, and unsuccessfully, Lucas's petition for instructions. Peter demonstrates absolutely no basis for any argument that he is entitled to attorney fees. His claim was rightly rejected by Judge Wiss, a ruling we affirm.

We close with the observation that Peter reminds us many times how the James Trust is rather modestly funded, somehow lending support to his position as to the dire consequences of Judge Wiss's ruling. As Peter says at one point, "If the Trial Court's order is not reversed, the door will be wide open to distributions . . . without regard to whether James has any actual need for such distributions. James's personal estate under

17

his control, which the Trustee believes has 'significant assets,' to the extent that he may be a 'multimillionaire,' will be preserved at the expense of a relatively small trust, funded in 2012 and 2013 with total assets valued at $427,623." Coupled with this "concern" is the theme repeated below, and here, that Peter is looking out for possible future beneficiaries in the event James marries, as shown, for example, in the colloquy with Judge Wiss in footnote 5

We need not get into the motivation for Peter's vigorous resistance to Lucas's petition, as it is not pertinent to our decision here. What is pertinent is that Lucas is a professional fiduciary who must conduct himself within the law, and thus will, before making a distribution, consider what he should consider. (Probate Code § 16081.)

## DISPOSITION

The order is affirmed. Lucas shall recover his costs on appeal.

_____
Richman, J.


We concur:


_____
Kline, P.J.


_____
Miller, J.