Filed 4/24/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THOMAS W. SEFTON, JR., | D065898 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. P82080) |
| HARLEY K. SEFTON, as Trustee, etc., | |
| Defendant and Respondent; | |
| WELLS FARGO BANK, N.A., as Successor Trustee, etc., | |
| Objector and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Julia Craig Kelety, Judge. Reversed with directions.

Van Dyke & Associates, Richard S. Van Dyke and James A. Bush for Plaintiff and Appellant.

Beamer, Lauth, Steinley & Bond, Stephen A. Bond and Phillip A. Bond for Defendant and Respondent.

Henderson, Caverly, Pum & Charney, Kristen E. Caverly and Debra J. Vella for Objector and Respondent.

Plaintiff Thomas W. Sefton, Jr. (Thomas Jr.) appeals a judgment awarding him $565,350, plus interest, from the estate of his grandfather, Joseph W. Sefton, Jr. (Grandfather). The probate court, interpreting our prior opinion in this matter (*Sefton v. Sefton* (2012) 206 Cal.App.4th 875 (*Sefton I*)), determined this sum to be the " 'substantial' share" of Grandfather's estate to which Thomas Jr. was entitled. (See *id.* at p. 895.) Thomas Jr. contends the probate court misinterpreted *Sefton I* and therefore improperly limited his award from Grandfather's estate.

We conclude the probate court's interpretation of *Sefton I*, while reasonable, was in error. The " 'substantial' share" determined by the probate court is not the correct measure of Thomas Jr.'s award from Grandfather's estate under the facts of this case. We do not fault the probate court for this error. As we will explain, portions of *Sefton I*, and in particular the sentence directing the probate court on remand, are ambiguous in their meaning. In this opinion, we resolve the ambiguity and clarify the award to which Thomas Jr. is entitled.

FACTUAL BACKGROUND

The relevant facts are largely undisputed. The facts in this section are drawn from the parties' stipulated facts in the probate court and this court's prior opinion in *Sefton I, supra*, 206 Cal.App.4th at pages 880-881.

Grandfather died in 1966. In Grandfather's will executed September 7, 1955, Grandfather created a testamentary trust (the Trust) for the benefit of his son, Thomas W. Sefton (Father), during Father's life. Upon Father's death, the Trust terminated and its assets were to be distributed. As relevant here, Grandfather's will empowered Father to

2

appoint the objects of this distribution, in part, as follows: "[T]hree quarters (3/4) [of the Trust estate] shall be distributed to [Father's] then living issue as [Father] shall by his Last Will and Testament appoint, and in default of appointment, to his then living issue on the principle of representation."

Father died in 2006. Father left a will that he had executed on August 26, 1994. At the time of Father's death, his then living issue were Thomas Jr. (the only child of Father's first marriage), Harley K. Sefton (Harley) (the son of Father's second marriage), Laurie Sefton (Laurie) (the daughter of Father's second marriage), Harley's three children, and Laurie's child. Father's will exercised his power of appointment by splitting the property subject to appointment into three shares, two of which he allocated to an irrevocable trust established for the benefit of Harley and his children (the Harley Family Trust), and the other one of which he allocated to an irrevocable trust established for the benefit of Laurie and her child (the Laurie Family Trust). Father's will did not appoint any of the property subject to appointment to Thomas Jr.[1]

Based on the directions in Father's will, the trustee of Grandfather's Trust distributed approximately $37.8 million in cash, securities, and related income to the Harley Family Trust and $18.8 million in cash, securities, and related income to the Laurie Family Trust. The trustee also distributed approximately $3.5 million in short-term and long-term investment loss carryovers to the Harley Family Trust and a $1.7

---

[1]    Upon Father's death, Thomas Jr. received a $25,000 distribution from a separate trust established by Father. The probate court characterized this distribution as a "testamentary snub" under the circumstances of this case.

million capital loss carryover to the Laurie Family Trust. The trustee did not distribute anything to Thomas Jr.

Harley currently acts as the trustee of the Harley Family Trust. Wells Fargo Bank, N.A. (Wells Fargo) currently acts as the trustee of the Laurie Family Trust.

PROCEDURAL HISTORY

In 2010, Thomas Jr. filed a petition in probate court challenging the distribution of Grandfather's Trust estate. Based on the common law, Thomas Jr. alleged that the power conferred on Father by Grandfather's will was a nonexclusive power of appointment, i.e., the power to appoint to the permissible objects named in Grandfather's will but without the power to exclude any of the permissible objects from receiving a substantial distribution of the appointive property. Because Thomas Jr. was named as a permissible object of appointment in Grandfather's will (as one of Father's "then living issue"), Father could not exclude Thomas Jr. from at least a substantial distribution. Thomas Jr. alleged that "distribution of an amount comprising a *substantial distribution* of the Trust, to [Thomas Jr.] outright and free of trust would best comply with the non-exclusive power of appointment [Grandfather] conferred at the time of his death." (Original italics.) Thomas Jr. prayed for an order ascertaining the beneficiaries of the Trust as set forth in the petition and for any other proper relief.

Harley, as trustee of the Harley Family Trust, filed a response and objection to Thomas Jr.'s petition. Among other objections, Harley contended that Father's

4

appointment power was governed by Probate Code section 652,[2] which states that a special power of appointment is exclusive unless the person creating the power (the "donor") specifies a minimum share or amount that must be appointed to each object. Because Grandfather's will did not specify such a minimum share, Harley argued, Father had the power to exclude Thomas Jr. from any distribution from Grandfather's Trust. Wells Fargo, as trustee of the Laurie Family Trust, filed a demurrer making the same argument, among others. The probate court sustained Wells Fargo's demurrer and entered a judgment dismissing the petition.

Thomas Jr. appealed. On appeal, the primary question was whether the appointment power Grandfather conferred on Father was exclusive or nonexclusive. In *Sefton I*, this court concluded that Father's power of appointment was nonexclusive, i.e., Father was required to make at least a substantial distribution of the Trust estate to each permissible object, including Thomas Jr. (*Sefton I, supra*, 206 Cal.App.4th at pp. 887, 889.)

*Sefton I* determined that powers of appointment in California at the time of the execution of Grandfather's will, and at Grandfather's death, were governed by common law. (*Sefton I, supra*, 206 Cal.App.4th at p. 883, citing *Estate of Sloan* (1935) 7 Cal.App.2d 319, 332 (*Sloan*).) Under the common law, as interpreted by the leading case of *Sloan*, "where the donor of a power of appointment designated a class of appointees and did not expressly give the donee any right of exclusion, no member of the designated

_____

[2]     Further statutory references are to the Probate Code unless otherwise stated.

class 'may be entirely excluded by the donee of the power from at least a *substantial* participation in the distribution' of the appointive property." (*Sefton I, supra*, 206 Cal.App.4th at p. 883, quoting *Sloan, supra*, 7 Cal.App.2d at p. 340, italics added by *Sloan*.) Under the common law as it existed in California, therefore, the power of appointment conferred by Grandfather was nonexclusive. (*Ibid.*)

However, as *Sefton I* explains, four years after Grandfather's death, the California Legislature enacted the California Powers of Appointment Act (CPAA), now codified at sections 600 through 695 of the Probate Code. (*Sefton I, supra*, 206 Cal.App.4th at pp. 885-886.) Although generally retaining the common law (§ 600), the CPAA departed from the common law rules on powers of appointment in several important ways. As relevant here, section 652 changed the common law rule favoring nonexclusive powers of appointment described in *Sloan*. (*Sefton I, supra*, 206 Cal.App.4th at p. 886.) Section 652 states that a special power of appointment is *exclusionary* unless the donor specifies a minimum share or amount to be appointed to the objects. Section 652 therefore "changed the nonexclusive presumption in [*Sloan*] to an exclusive presumption . . . ." (*Sefton I, supra*, 206 Cal.App.4th at p. 884.)

To resolve the potential contradiction between the common law and section 652, and identify the law governing Father's appointment power, *Sefton I* looked to the retroactivity provision of the CPAA, section 601.[3] *Sefton I* interpreted section 601 "to

---

3       That section provides: "If the law existing at the time of the creation of a power of appointment and the law existing at the time of the release or exercise of the power of appointment or at the time of the assertion of a right given by this part differ, the law

6

mean that the nonexclusive power of appointment Grandfather provided for in his will remained intact after enactment of the CPAA because (1) the language of [the second sentence of section 601] provides that the original power of appointment is unaffected by the terms of the later enacted CPAA, and (2) had the effect of leaving intact Grandfather's original intent in drafting his will." (*Sefton I, supra*, 206 Cal.App.4th at p. 887.) *Sefton I* noted that this interpretation of the CPAA also avoided any constitutional concerns that might arise if the CPAA were interpreted to affect any rights vested under prior law. (*Sefton I, supra*, 206 Cal.App.4th at p. 889.) "Thus, the more reasonable (and constitutional) interpretation of the second sentence of section 601 is that it was adopted to prevent retroactive application of that section to powers of appointment, and vested rights thereunder. This is because any rights a donee has in a will or trust vest at the time of the death of the donor, and subsequent legislation cannot impair such rights. [Citations.] At the time of Grandfather's death, Father was given a life estate and, because the power of appointment under the law then in place was 'nonexclusive,' all of Father's heirs were entitled, upon his death, to at least a 'substantial' share of the estate." (*Sefton I, supra*, 206 Cal.App.4th at p. 889.)

After discussing defenses based on the statute of limitations and the doctrine of laches, *Sefton I* turned to the remedy for Father's exclusion of Thomas Jr. from any distribution from Grandfather's trust, i.e., "the proper remedy for Father's defective power of appointment." (*Sefton I, supra*, 206 Cal.App.4th at p. 895.) *Sefton I* stated that

existing at the time of the release, exercise, or assertion of a right controls. Nothing in this section makes invalid a power of appointment created before July 1, 1970, that was valid under the law in existence at the time it was created." (§ 601.)

7

Thomas Jr. advocated for an application of section 672 of the CPAA,[4] whereas Harley and Wells Fargo advocated for the application of section 670.  (*Sefton I, supra*, 206 Cal.App.4th at p. 895.)  "Under his analysis of section 672, Thomas Jr. asserts that he should be entitled to a division of the appointive property equally with his siblings, Harley and Laurie.  [Harley and Wells Fargo] on the other hand assert that if Father's power of appointment was ineffectual, it is governed by section 670 and under that section, Thomas Jr.'s share would be a 'substantial' share, as he has sought in his petition under the rule enunciated by [*Sloan*]."  (*Sefton I, supra*, 206 Cal.App.4th at p. 895.)

Without adopting either view, *Sefton I* stated as follows: "We conclude that because Thomas[] Jr.'s claim is based upon the common law rule enunciated in [*Sloan*], we shall remand this case for a determination of what constitutes a 'substantial' share of the estate."  (*Sefton I, supra*, 206 Cal.App.4th at p. 895.)  *Sefton I* reversed the judgment and remanded for further proceedings consistent with the opinion.  (*Sefton I, supra*, 206 Cal.App.4th at p. 896.)

On remand, the parties stipulated to allow Thomas Jr. to file a supplement to his petition.  The parties also stipulated to allow Harley and Wells Fargo to file supplements or amendments to their responses and objections.  Thomas Jr.'s supplement interpreted *Sefton I* as "providing the common law/[*Sloan*] remedy in favor of Thomas[] Jr."  Citing *Sloan* and other authorities, Thomas Jr.'s supplement alleged that "[t]he common law of

---

4    Notwithstanding the characterization of his argument in *Sefton I*, Thomas Jr. contends his argument based on section 672 was intended to apply only if the CPAA were found to govern Grandfather's will.

nonexclusive powers of appointment provides that, if the donee fails to appoint a substantial share to all the permissible appointees, the remedy to be imposed by the courts is to determine their substantial shares by following any instructions of the donor as to how to distribute the appointive property in the event of a default in the exercise of the power . . . ." Relying on the language of Grandfather's will that "in default of appointment" the appointive property should pass "to [Father's] then living issue on the principle of representation[,]" as well as principles of intestate succession, Thomas Jr.'s supplement prayed for an award of one-third of the appointive property. The supplement also prayed for an award of interest, attorney's fees, and any other proper relief.

In its supplemental objection, Wells Fargo disagreed with Thomas Jr.'s interpretation of *Sefton I*. Wells Fargo argued that *Sefton I* "ruled that [Thomas Jr.] could not be completely disinherited by exercise of the power of appointment and, therefore, has stated a claim and is entitled to a 'substantial' share of the gift he would have received but for the exercise. . . . [*Sefton I*] did not invalidate the power of appointment exercised by [Father] which presumably controls disposition of the trust funds in excess of a substantial share, which is the smallest amount Father was required to appoint to [Thomas Jr.] . . . ." Similarly, in his answer to Thomas Jr.'s supplement, Harley alleged, "Section 670 should be applied to ratify Father's exercise of power of appointment so far as possible. Only that minimum amount (if any, in view of [Harley's] defenses) needed to satisfy an appointive share that is not an 'illusory share' should pass to [Thomas Jr.]."

After further litigation, the probate court determined that Harley and Wells Fargo's interpretation of *Sefton I* was correct. The court noted that *Sefton I* did not expressly

9

adopt either Thomas Jr.'s argument based on section 672 or Harley and Wells Fargo's arguments based on section 670.  However, the court concluded that *Sefton I* required it to "determine what 'substantial' share Thomas Jr. is entitled to under the controlling authority as enunciated in *Sloan*."  The court interpreted *Sefton I* as implicitly rejecting Thomas Jr.'s approach based on the default of appointment provision in Grandfather's will.

The court therefore held a trial, based on legal authorities and the stipulated facts described above, to determine the amount of a "substantial" share as described in *Sloan* and other common law authorities.  Thomas Jr. continued to argue that such a determination was not a remedy supported by *Sefton I*, *Sloan*, or the common law. Referring to various common law authorities, Harley and Wells Fargo proposed several methodologies for determining a "substantial" share, including as a percentage of an equal share of the appointive property, as a percentage of the value of the appointive property as a whole, as a percentage of the distribution that would occur in default of appointment, or as a specific sum.

In its judgment after trial, the court again rejected Thomas Jr.'s approach:  "On the merits, as an initial matter, the court rejects [Thomas Jr.'s] argument that this court should find that there has been a default of appointment, entitling him to a one-third intestate share.  First, such a conclusion is beyond the ruling [in *Sefton I*], which remanded the case to this court with instruction to determine [Thomas Jr.'s] substantial share.  Second, it appears that [*Sefton I*] has decided this issue, when it directed this court to proceed under a theory (substantial share) that is incompatible with a default of appointment

10

theory. Third, even if the issue were before this court, this court would conclude there has not been a default of appointment, for the reasons set forth in [Harley's] Trial Brief . . . ."

To determine a "substantial" share, the court reasoned that dividing the appointive property equally would result in seven shares because Father had seven then living issue at the time of his death. The court concluded that seven percent of such a one-seventh share would be "substantial," resulting in an award of $565,350, plus interest, to Thomas Jr. The court directed that one-third of the award be paid from the Laurie Family Trust, and two-thirds from the Harley Family Trust, consistent with the proportions of the appointive property distributed to them. The court denied Thomas Jr.'s other prayers for relief. Thomas Jr. appeals.

## DISCUSSION

### I. *The Parties' Contentions*

Thomas Jr. argues that the probate court erred in interpreting *Sefton I*. Focusing on the main body of the opinion, along with the first half of the sentence discussing remand ("We conclude that because Thomas[] Jr.'s claim is based upon the common law rule enunciated in [*Sloan*] . . . "), Thomas Jr. contends that *Sefton I* determined that the common law should apply to Thomas Jr.'s claim and any remedy. Thomas Jr. claims the common law remedy under the circumstances here is clear and undisputed: application of the default of appointment provision in Grandfather's will, which would result in one-third of the appointive property being distributed to Thomas Jr. He also attacks the

11

probate court's calculation of a "substantial" share as legally and methodologically unsound.

In response, Harley and Wells Fargo argue that the probate court's judgment was correct. Focusing on other portions of our opinion in *Sefton I*, along with the second half of the sentence discussing remand (" . . . we shall remand this case for a determination of what constitutes a 'substantial' share of the estate"), Harley and Wells Fargo contend that this court crafted a hybrid remedy based on the common law and the CPAA. Under the doctrine of law of the case, they argue, this court should not revisit that determination. Harley also contends that such a remedy is correct on its merits.

## II. *The Meaning of* Sefton I*'s Directions on Remand*

The meaning of this court's opinion in *Sefton I* presents a question of law, which we consider de novo. (See *Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 779-780.) In *Sefton I*, we stated, "We conclude that because Thomas[] Jr.'s claim is based upon the common law rule enunciated in [*Sloan*], we shall remand this case for a determination of what constitutes a 'substantial' share of the estate." (*Sefton I, supra*, 206 Cal.App.4th at p. 895.) The probate court correctly noted that this direction was "somewhat confusing." As we will explain, the remedy that follows from the application of the common law and *Sloan* is incompatible with our direction to the probate court to determine a "substantial" share. Our direction to the probate court on remand in *Sefton I* was therefore ambiguous.

We begin with *Sloan*, the closest California authority to this dispute and the subject of extensive discussion in *Sefton I*. *Sloan* considered a power of appointment

12

created by a donor in favor of his son. "The will . . . provided that if . . . the said son should die under the age of 30 years . . . [¶] 'said trust fund and any real estate then held by said trustee for this trust shall go to, belong to, vest in and be distributed by a court of competent jurisdiction *to the heirs of said* [*son*] *as per his last will and testament*.' " (*Sloan, supra*, 7 Cal.App.2d at p. 321, italics added.) In his will, the son exercised the power of appointment in favor of a maternal aunt, whom he designated to receive the entire trust estate. (*Ibid.*) In doing so, the son's will excluded two paternal aunts who were also the son's heirs. (*Id.* at p. 322.) The two excluded aunts challenged the distribution of the trust estate to the maternal aunt designated by the son. (*Ibid.*)

Like *Sefton I*, *Sloan* was primarily concerned with the nature of powers of appointment in California. Because a statute on powers of appointment had been enacted in California and later repealed, the two excluded aunts argued "that in the state of California powers of appointment are of no validity . . . ." (*Sloan, supra*, 7 Cal.App.2d at p. 322.) After a lengthy discussion, *Sloan* rejected this argument, concluding that the effect of the repeal was to reinstate the common law governing powers of appointment: "[T]he repeal of the statute by which the preexisting common-law right to make a power of appointment was declared had no effect upon such right other than to work a revival of it, or one might say, a restoration of its natural parentage . . . ." (*Id.* at p. 332.)

To interpret the effect of the power of appointment at issue, *Sloan* looked to the common law. (*Sloan, supra*, 7 Cal.App.2d at p. 332 ["[I]t is manifest that the whole question is solved whenever it is determined what the common-law rule is."]; *id.* at p. 339.) The son "left a purported will by the terms of which he appointed one of his heirs

13

as the person to whom such trust fund 'shall go to, belong to, vest in', etc.  He left other 'heirs' who, by his failure to provide for them in his will, were effectually excluded or omitted from any appointment under the power of which he was the donee."  (*Id.* at p. 339.)  *Sloan* determined that, under the common law, the son's appointment was invalid because the son excluded members of the class (the son's "heirs") designated as permissive appointees by the donor:  "In such circumstances, the law is fairly well established that in the absence of controlling statute to the contrary, in exercising the power of appointment, no member of a class designated by the donor of the power may be completely excluded by the donee of the power from at least a substantial participation in the distribution of the trust fund or estate."  (*Id.* at p. 340.)  *Sloan* further explained, " 'At common law if the donor of a power of appointment by will has, in the instrument creating the power, designated a class of persons among whom the subject of the power is to be appointed, the provisions of a will which excludes any of the class will not be a valid execution of the power. ' "  (*Ibid.*)  After reviewing several secondary sources and out-of-state authorities, *Sloan* concluded that the power of appointment conferred on the son was nonexclusive.  (*Id.* at p. 341.)  Because the son's will excluded two of his heirs from any distribution from the trust estate, the son's power of appointment was "invalidly exercised" under common law.  (*Ibid.*)

Sloan therefore reversed the trial court's judgment, which had directed distribution of the trust estate in accordance with the son's will.  (*Sloan, supra*, 7 Cal.App.2d at pp. 322, 342.)  The case was remanded with instructions to identify those persons "who, in accordance with the decision herein, are entitled to distribution of the estate as heirs of

14

the donee of the power" and to order distribution of the trust estate to those heirs, or their representatives, "in accordance with their respective rights as such heirs." (*Id.* at p. 342.) *Sloan* did not seek to preserve the son's appointment, in whole or in part, and did not contemplate awarding a "substantial" share to any of the omitted heirs.

The decision in *Sloan* appears consistent with the traditional common law understanding of powers of appointment. "According to the English equity rule . . . where a power was given to appoint property among designated persons, in shares to be determined by the donee of the power, but without authority given to exclude any of such persons from the distribution, it was presumed to be the intention of the donor that, in the exercise of the power, each object, if he had not otherwise been provided for within the meaning of the rule, was entitled to a real and substantial, not a merely nominal, portion of the property; and it was held that if, considering the circumstances of the particular case as well as proportions and figures, the share given to any one of the objects was so small as not to be in accordance with such presumed intention, it was to be deemed merely illusory, so as to render the attempted exercise of the power wholly invalid." (Annot., Nonexclusive Powers and Illusory Appointments (1936) 100 A.L.R. 343, § 1 (Nonexclusive Powers).) Similarly, under *Sloan*, powers of appointment were presumed to be nonexclusive. (*Sloan, supra*, 7 Cal.App.2d at pp. 340-341.) If each permissible appointee did not receive at least a substantial distribution from the appointive property, the power of appointment was "invalidly exercised" and the attempted appointment failed. (*Ibid.*) This situation is commonly described as a "default

15

of appointment." (See, e.g., *Estate of Thorndike* (1979) 90 Cal.App.3d 468, 480 (*Thorndike*).)

At common law, the remedy for such an invalid exercise of the power of appointment was to disregard the donee's attempted appointment and distribute the property according to the donor's testamentary scheme, if any. (3 Powell on Real Property (2013) § 33.17[3]; see *Estate of Baird* (1955) 135 Cal.App.2d 333, 339.) A number of common law cases apply this rule.[5] (See, e.g., *Burleigh v. Pearson* (1749) 27 Eng.Rep. 1032, 1032-1033; *Pocklington v. Bayne* (1785) 28 Eng.Rep. 1234; *Vanderzee v. Aclom* (1799) 31 Eng.Rep. 399, 400, 406; *Lippincott v. Ridgway* (1854) 10 N.J.Eq. 164, 171; *Inglis v. McCook* (N.J.Ct.Ch. 1904) 59 A. 630, 636-637; *Cameron v. Crowley* (N.J.Ct.Ch. 1907) 65 A. 875, 877; *Beattie v. Adams* (N.J.Ct.Ch. 1938) 198 A. 201, 203; *Hopkins v. Dimock* (N.J.Ct.Ch. 1946) 48 A.2d 204, 206; *Hedges v. Russell* (N.J.Super.Ct. 1948) 61 A.2d 910, 912-913.)

---

[5]     Modern trends in the common law outside of California appear to contradict some of the principles approved in *Sloan*. The Restatement of Property, for example, discarded the traditional presumption of nonexclusivity in favor of various alternative rules. (See Rest., Property (1940) § 360; Rest.2d Property, Donative Transfers (1986) § 21.1; Rest.3d Property, Wills & Donative Transfers (Tent. Draft No. 5, Mar. 27, 2006) § 17.5.) *Sloan*, however, states the common law that governs this dispute, and its adoption of the traditional common law governing powers of appointment is clear. (See *Sefton I, supra*, 206 Cal.App.4th at pp. 882-883, 888-889; *Sloan, supra*, 7 Cal.App.2d at pp. 340-341.) We note that many of the modern trends in the common law are embodied in the CPAA, including its rejection of the traditional nonexclusivity presumption. (§ 652; see fn. 10, *post*.) England, too, has by statutory enactment modified a number of the traditional common law rules governing powers of appointment. (See, e.g., Nonexclusive Powers, *supra*, 100 A.L.R. 343, § 3.)

As part of his or her testamentary scheme, the donor may specify the persons who will take property in default of appointment. (See *Thorndike, supra*, 90 Cal.App.3d at p. 480.) They are termed "takers in default of appointment." (*Id.* at p. 477.) This situation is illustrated in the original Restatement of Property. The illustration posits, "A by will transfers a fund of $100,000 in trust for B for life and then in trust 'for all and every the children of B in such shares and proportions as B shall by will appoint, and in default of appointment for the children of B equally.' B has three children, all of whom survive him." (Rest., Property (1940) § 361, illus. 1.) "B appoints the whole fund to two of the three children. The appointment is void and the fund passes equally to the three children in default of appointment." (*Ibid.*)

The remedy in *Sloan* appears consistent with this traditional common law remedy. *Sloan* did not preserve the appointment set forth in the son's will. Instead, *Sloan* remanded the case for "a determination by it of the names of the persons who . . . are entitled to distribution as heirs of the donee of the power" and for distribution in accordance with their rights as such heirs, i.e., intestate succession. (*Sloan, supra*, 7 Cal.App.2d at p. 342.) Normally, as we have noted, the appointive property would pass through the *donor's* testamentary scheme if the attempted appointment by the donee is invalid. *Sloan*, by referring to the heirs of the *donee*, i.e., the son, appears to have interpreted the donor's will as expressing the intention that the appointive property go to the donee's heirs even in default of appointment.

The parties have cited no common law authority in which an excluded appointee was given a "substantial" share as the remedy for his or her exclusion. As we have noted,

17

the "substantial" share is used to determine whether a permissible appointee has received a non-illusory share of appointive property. (Nonexclusive Powers, *supra*, 100 A.L.R. 343, § 1; see *Sloan, supra*, 7 Cal.App.2d at p. 340.) At common law, the concept of the "substantial" share was irrelevant once it was determined that a permissible appointee had *not* received a "substantial" share (and had thus been excluded). Therefore, our direction to the probate court in *Sefton I*, which combined the concept of common law remedies and *Sloan* with the direction to the probate court to determine Thomas Jr.'s "substantial" share was ambiguous. Although the parties cite various other portions of *Sefton I* in their attempts to interpret our direction conclusively, none of these portions are dispositive. To resolve this ambiguity, we now turn to the remedy due Thomas Jr. under the facts of this case.[6]

---

6      Harley and Wells Fargo contend that the doctrine of law of the case prevents this court from examining Thomas Jr.'s remedy in this appeal. " 'The doctrine of "law of the case" deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal*. The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.' " (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491.) We decline to apply the doctrine here, however, because *Sefton I* did not "stat[e] a rule of law necessary to the decision of the case." (See *ibid*.) As we have explained, the meaning of our direction to the probate court on remand was ambiguous; there is no rule of law for us to apply in this subsequent appeal. (See *Feig v. Bank of America etc. Assn.* (1936) 5 Cal.2d 266, 272.) Moreover, even if the doctrine applied to enforce the remedy of a " 'substantial' share," we would decline to adhere to *Sefton I* on this point because to do so would be manifestly unjust. On this point, assuming that *Sefton I* intended the remedy of a " 'substantial' share," it was "a manifest misapplication of existing principles resulting in substantial injustice" for reasons we will explain *post*. (*Morohoshi v. Pacific Home, supra*, 34 Cal.4th at pp. 491-492.) The " 'substantial' share" remedy does not appear to have been applied in any reported case in California or elsewhere, and it contradicts hundreds of years of common law rulings, including *Sloan*. It results in the extinguishment of Thomas Jr.'s vested

18

## III. *Thomas Jr.'s Remedy*

The issue of Thomas Jr.'s remedy presents questions of law, which we review de novo. (See *Topanga and Victory Partners v. Toghia, supra*, 103 Cal.App.4th at pp. 779-780.) Because we conclude that the " 'substantial' share" remedy is unsupported by the law, we need not decide the proper standard of review for the trial court's determination regarding the proportion of the appointive property that would constitute a such a share.

Except as modified by statute, the common law continues to govern powers of appointment in California. (§ 600.) Under the common law, as we have explained, a donee of a nonexclusive power of appointment may not exclude a permissible appointee from at least a substantial share of the appointive property. (*Sloan, supra*, 7 Cal.App.2d at p. 340.) A donee whose appointment excludes a permissible appointee has "invalidly exercised" his nonexclusive power of appointment, thereby rendering it void. (*Id.* at p. 341; Rest., Property (1940) § 361, illus. 1.) The appointive property passes according to the donor's testamentary scheme, without regard for the donee's attempted appointment. (See *Sloan, supra,* at p. 340; Rest., Property, *supra*, § 3651, illus. 1.) Here, under common law, Father's attempted appointment, which excluded Thomas Jr., was invalid and void.[7] The appointive property therefore passes according to Grandfather's

---

rights as a taker in default in Grandfather's will and his loss of some $18 million from the Trust estate. To adhere to such a remedy—after the error has been shown to this court—would offend principles of substantial justice.

[7]   On appeal, as in the probate court, Harley contends the $25,000 distribution that Father awarded Thomas Jr. from his own assets remedies Thomas Jr.'s exclusion from any distribution from Grandfather's Trust. We reject this argument, as did the probate

testamentary scheme, which provided that in default of appointment the appointive property should pass to Father's then living issue, on the principle of representation. Under common law, therefore, Thomas Jr. is entitled to one-third of the Trust estate as a taker in default of appointment.

Under the circumstances of this case, the CPAA appears to support this common law remedy. Section 672, subdivision (a), provides as follows: "[I]f the donee of a discretionary power of appointment fails to appoint the property, releases the entire power, or makes an ineffective appointment, in whole or in part, the appointive property not effectively appointed passes to the person named by the donor as taker in default or, if there is none, reverts to the donor."[8] The comments of the Law Revision Commission confirm that section 672 continues the common law governing dispositions in default of appointment: "Section 672 states the rules determining to whom property passes that has not been effectively appointed. Subdivision (a) states the accepted common law rule. See Restatement of Property § 365(1) (1940); see also Restatement (Second) of Property

court. Even if an award of other assets could remedy Thomas Jr.'s exclusion under California common law (see *Kemp v. Kemp* (1801) 31 Eng.Rep. 891, 897 [recognizing this principle but nonetheless finding donee's exercise of a nonexclusionary power of appointment void because one permissible appointee received only an illusory share]), Father's award was too small under the facts and circumstances of this case to be effective. We note the probate court found a "substantial" share of Grandfather's Trust to be $565,350, not $25,000.

[8] Section 672, subdivision (b), states an exception to this rule in cases of a general power of appointment. "A power of appointment is 'general' only to the extent that it is exercisable in favor of the donee, the donee's estate, the donee's creditors, or creditors of the donee's estate, whether or not it is exercisable in favor of others." (§ 611, subd. (a).) The power of appointment at issue here is special, not general. (See § 611, subd. (d).)

(Donative Transfers) §§ 23.1, 23.2 (1986). It also accords with the established rule in California. *Estate of Baird*, 120 Cal.App.2d 219, 260 P.2d 1052 (1953); *Estate of Baird*, 135 Cal.App.2d 333, 287 P.2d 365 (1955) (later decision in same case on different point). Under this section, the property passes directly from the donor to the ultimate takers." (Cal. Law Revision Com. com., 52 West's Ann. Prob. Code (2002 ed.) foll. § 672, p. 368.) We therefore need not resolve any conflict between the common law and the CPAA on this point.

Relying on language in section 672, subdivision (a), referring to "the appointive property not effectively appointed," Harley argues that application of section 672 here "only begs the question, what part of the appointment in this case is ineffective?" Under the circumstances of this case, in which the scope of Father's power to appoint is governed by common law (*Sefton I, supra*, 206 Cal.App.4th at p. 887), the answer must be that Father's appointment, if not wholly ineffective, is at least ineffective to the extent it deprives Thomas Jr. of the appointive property that would pass to him under the common law through the takers in default provision of Grandfather's will. Only Thomas Jr. challenges the distribution of the Trust estate, so we need not decide the question of ineffectiveness any more broadly.

Harley also contends that, under the common law, the remedy due an excluded permissible appointee was not always invalidation of the entire appointment. The situation Harley discusses, however, concerns excluded permissible appointees who subsequently receive appointive property through a takers in default provision and thus cannot be said to have been completely excluded. (See Howe, *Exclusive and*

21

*Nonexclusive Powers and the Illusory Appointment* (1944) 42 Mich.L.Rev. 649, 662 (Howe).)  As the law review article cited by Harley explains, "It is possible that the exercise will be made in favor of a stranger and some of the objects.  In this case the exercise in favor of the stranger is void, but the court may hold that the other part of the appointment is valid.  If this is true the share that was improperly given will pass to the other objects, assuming they are takers in default, and thus satisfy the condition that all are to share in the appointment."  (*Ibid.*)  Here, there is no stranger (i.e., an *impermissible* appointee) whose appointment may be voided without affecting the appointment to the permissible appointees.  Even assuming the principle articulated in the article cited by Harley were a correct statement of the common law adopted in California, Father's appointment cannot be saved through partial invalidation in this way.[9]

Harley points out that the CPAA appears to have adopted a similar partial invalidation principle in section 670:  "An exercise of a power of appointment is not void solely because it is more extensive than authorized by the power, but is valid to the extent that the exercise was permissible under the terms of the power."  The comments of the Law Revision Commission explain, "Section 670 makes clear that, when a power is exercised partly in favor of an unauthorized person, the exercise is valid to the extent that it is permissible under the terms of the power. . . .  [¶] Section 670 also covers other types

---

[9]    We note that the article adopts the general common law rule rendering void an appointment that attempts to exclude a permissible appointee:  "It is seldom questioned that an exercise of a nonexclusive power is *void* in any case where one of the objects does not receive a share of the property."  (Howe*, supra*, 42 Mich.L.Rev. at p. 667, italics added.)

22

of nonpermissible exercises of the power.  For example, if the donor of a power specifies that the donee is to appoint 20 percent or less of the corpus of a trust to each of six permissible appointees and the donee appoints 25 percent to one of the permissible appointees, this section permits the appointee to receive 20 percent of the assets.  Thus, an appointment of an excess amount will not invalidate the appointment, but will instead be deemed to be an appointment of the maximum amount."  (Cal. Law Revision Com. com., 52 West's Ann. Prob. Code, *supra,* foll. § 670, p. 366.)  Here, again, Father did not appoint an unauthorized or impermissible person.  Nor did he exceed a specified maximum appointment in Grandfather's will.  Father did not "solely" exercise his power in a manner "more extensive than authorized by the power."  (§ 670.)  Instead, the flaw in Father's appointment was that he failed to appoint any property to a permissible appointee, which was inconsistent with the power conferred on him by Grandfather under the common law.  Section 670 does not apply in this situation.[10]

---

[10]     Harley also cites the Restatement Second of Property, Donative Transfers (1986) § 21.2, comment g, which provides as follows: "If the donee of a non-exclusive power exercises the power in a manner that excludes an object from receiving a specified share of the appointive assets, the appointment is ineffective to the extent necessary to eliminate such exclusion, and the balance of the appointment is effective."  However, like the CPAA, the Restatement Second of Property contemplates that a power of appointment is exclusive "unless the donor specifies the share of appointive assets from which an object may not be excluded."  (Rest.2d Property, Donative Transfers (1986) § 21.1; see § 652.)  Because the donor has specified a minimum share, the remedy for the excluded appointee is to seek that minimum share.  (Rest.2d Property, Donative Transfers, *supra*, § 21.2, cmt. g.)  The assumptions underlying this analysis, and its conclusion, run directly counter to pre-CPAA common law as adopted in California.  (See *Sefton I, supra*, 206 Cal.App.4th at p. 889; *Sloan, supra*, 7 Cal.App.2d at p. 341.)  These sections of the Restatement Second of Property may have relevance to powers of appointment governed entirely by the CPAA, including the remedies due under sections

23

Harley also argues that the " 'substantial' share" remedy applied by the probate court is correct because it preserves Father's attempted appointment, to the extent possible, and is more consistent with Grandfather's expressed intent. As *Sefton I* recognized, " ' " '[t]he paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.' " ' " (*Sefton I, supra*, 206 Cal.App.4th at p. 884.) "[I]n divining that intent, a testator is presumed to be aware of the applicable law at the time a will is executed and to intend that law to govern construction of the will." (*Id.* at p. 885.) Consistent with these rules, *Sefton I* interpreted Grandfather's will as conferring a nonexclusive power of appointment on Father governed by common law, with the intent that each of the named permissible appointees receive a share of the appointive property. (*Id.* at pp. 886-887.) It follows that Grandfather intended the common law rule of *Sloan* to govern his will, including its confirmation of the longstanding principle that an exclusionary appointment by the donee of a nonexclusive power of appointment would render such an appointment invalid. (*Sefton, supra*, 206 Cal.App.4th at pp. 886-887; *Sloan, supra*, 7 Cal.App.2d at p. 341.) In fact, Grandfather anticipated such a situation by including a clause in his will specifying the disposition of his Trust estate "in default of appointment." The fact that Grandfather could not have known the CPAA would be enacted, as Harley points out, only underscores Grandfather's presumed intent that the common law apply to his will. Under

670 and 672. They are unpersuasive under the circumstances here, where the scope of Father's power of appointment is governed by the common law. (See *Sefton I, supra*, 206 Cal.App.4th at p. 887.)

24

the common law, as we have explained, Father's attempted appointment has no effect, regardless of the clarity of Father's expressed intent.

As in *Sefton I*, constitutional concerns guide our interpretation of the common law and the CPAA as applied to these circumstances. "[A]ny rights a donee has in a will or trust vest at the time of the death of the donor, and subsequent legislation cannot impair such rights." (*Sefton I, supra*, 206 Cal.App.4th at p. 889; see *id*. at pp. 891-892.) This principle applies equally to Thomas Jr.'s rights as a taker in default. (*Sefton I, supra*, at p. 889; see also Civ. Code, § 781 ["A general or special power of appointment does not prevent the vesting of a future estate limited to take effect in case such power is not executed."]; Rest.2d Property: Donative Transfers (1986) § 24.2, cmt. g, illus. 11 ["[W]hen the takers in default are specified by the donor and the donor imposes no conditions to their taking, the interest of each taker in default is vested subject only to divestiture by the exercise of the power."].) Harley's claim that constitutional concerns attach only to Thomas Jr.'s "indefeasibly" vested rights is unsupported by any relevant authority, and it is unpersuasive.

As we recognized in *Sefton I*, Thomas Jr.'s claim is "based on the common law rule enunciated in [*Sloan*]." Neither *Sloan*, nor any common law authority, authorizes the award of a " 'substantial' share" to Thomas Jr. as the remedy for Father's invalid exclusion. To the extent *Sefton I* is read to authorize such a remedy, such an interpretation is incorrect. The remedy in *Sloan*, as at common law, requires that Father's attempted exclusion of Thomas Jr. be set aside as invalid. Thomas Jr. should be awarded a one-third share of the appointive property as a taker in default under Grandfather's

will.[11]  As Thomas Jr. and Wells Fargo urge (and Harley does not contest), this share should be paid by the Harley Family Trust rather than the Laurie Family Trust.  The parties have not briefed, and we need not decide, the logistics of the payment.

DISPOSITION

The judgment is reversed.  The matter is remanded for further proceedings consistent with this opinion.  In the interests of justice, each party shall bear its own costs on appeal.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.

---

[11]    At oral argument, and without briefing the issue, Wells Fargo claimed that the pleadings filed by Thomas Jr. in the probate court do not support this remedy.  Wells Fargo further claimed, based in part on this alleged deficiency, that it should be entitled to recover its costs and attorney's fees for defending against Thomas Jr.'s action.  Because Wells Fargo did not include these issues in its briefing, and raised them for the first time at oral argument, we decline to consider their merits.  (*Palp, Inc. v. Williamsburg National Insurance Co.* (2011) 200 Cal.App.4th 282, 291, fn. 2 [" 'We do not consider arguments that are raised for the first time at oral argument.' "].)  In light of our disposition of this case, we also need not decide whether the probate court exceeded its equitable powers over trust administration by ordering the " 'substantial' share" remedy, as Thomas Jr. asserts.

26